Meagan Verschueren (CA 313117)
mverschueren@singletonschreiber.com
Katie Llamas (CA 303983)
kllamas@singletonschreiber.com
Kristina Aiad-Toss *Pro Hac Vice applicant*
ktoss@singletonschreiber.com
Marisa Ong *Pro Hac Vice applicant*
mong@singletonschreiber.com
Pilar Borneo
pborneo@singletonschreiber.com
SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Ste. 1025
San Diego, CA 92108
Tel. (619) 771-3473

Steven C. Babin, Jr. *Pro Hac Vice applicant*
steven.babin@babinlaws.com
Penny L. Barrick *Pro Hac Vice applicant*
penny.barrick@babinlaws.com
Babin Law, LLC
10 West Broad Street, Ste. 900
Columbus, Ohio 43215
Tel. (614) 761-8800

Attorneys for Plaintiff JANE DOE

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

| | |
|---|---|
| JANE DOE, an individual,<br><br>Plaintiff,<br><br>v.<br><br>G6 Hospitality Property, LLC; G6 Hospitality, LLC; G6 Hospitality IP, LLC; G6 Hospitality Purchasing, LLC; G6 Hospitality Franchising, LLC; Motel 6 Operating, LP; Wyndham Hotels & Resorts, Inc.; Wyndham Hotel Group, LLC; Days Inn Worldwide, Inc; Hollywood Host Ventures, Inc; CJS Corporation; The Glendale Hotel, LLC; Hollywood La Brea Inn, LLC; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES AND INJURIES**<br><br>**JURY TRIAL DEMANDED**<br>**Damages in excess of $100,000** |

COMES NOW Plaintiff JANE DOE by and through the undersigned counsel and respectfully submits this Complaint for damages and makes the following averments.

## INTRODUCTION

1. For years, sex trafficking ventures have openly operated in and out of hotels throughout the United States.

2. For years, hotel brand companies have made public claims that they are combatting human trafficking, while at the same time expanding their economy hotels where sex trafficking is most prevalent and profiting from crimes that are perpetrated on their properties. Despite corporate public statements, human trafficking continues to be most prevalent and lucrative in the hotel and hospitality industry.

3. Criminals parade their misconduct openly at certain hotel and motel properties throughout the United States, and the hotels and motels profit from providing harbor for the underlying heinous crimes. The hotel and hospitality industry continue to create and expand the environment for traffickers to harbor victims and neglect taking reasonable steps to prevent such known criminal misconduct, instead choosing to earn a profit at the expense of human life, human rights, and human dignity.

4. Public appearances and sponsorships do not excuse corporations and individuals that have financially benefited from sex trafficking. In fact, it reveals corporate knowledge of the use of their properties and technology as hubs for human trafficking. The hotel industry has provided the means, environment, and support for human trafficking industry to become the second largest profitable criminal activity in the United States.[1]

5. As the trafficking industry grows, so have Defendants and their profits through the expansion of their properties and rooms rented for this explicit and apparent purpose.

6. Jane Doe files this civil lawsuit seeking compensation and justice for the harms she suffered as a result of being sex trafficked and sold for sex at hotels owned, operated, managed, and controlled by Defendants and their agents and employees.

[1] https://www.mbfpreventioneducation.org/human-trafficking-is-now-the-second-most-profitable-criminal-activity-in-the-united-states/

**PARTIES**

7. Jane Doe is a natural person who was trafficked for sex in the State of California. Jane Doe is a survivor of sex trafficking. From 2014 to 2018, she was harbored and forced to engage in commercial sex acts for the benefit of her traffickers and Defendants.

a. Due to the sensitive and private nature of, and the likely retaliatory response to, these allegations, this Complaint identifies Jane Doe by a pseudonym only. Jane Doe will move the Court to proceed under a pseudonym in all filings, all public Court proceedings, and to limit the disclosure of information about Jane Doe's true identity in order to protect Jane Doe and her identity.

b. Generally, pleadings must state the name of all parties.[2] However, exceptions exist when the issues involved may result in retaliation or harm to the Plaintiff.[3] For good cause, the Court may issue an order to protect a party or person from undue harms and burdens.

c. To maintain her privacy and safety, Jane Doe should not be compelled to disclose her identity. Jane Doe's privacy interest substantially outweighs the customary practice of judicial openness.[4] Jane Doe would be in danger of being forced back into trafficking should her traffickers or their associates learn information about her through publicly filed documents in this action. Additionally, Jane Doe's life could be put in grave danger should her traffickers or their associates learn information about her through publicly filed documents in this action or that she is speaking out about what happened to her. Moreover, Defendants will not be prejudiced. Jane Doe will agree to reveal her identity to Defendants for the limited purpose of investigating Jane Doe's claims once the parties have entered into a protective order.

8. Defendants, G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property,

---

[2] Fed. R. Civ. P. 10(a).

[3] See WA Cases e.g., Doe v. Penzato, 2011 U.S. Dist. LEXIS 51681, *6-9 (N.D. Cal. May 13, 2011); Roe v. St. Louis
Univ., 2009 U.S. Dist. LEXIS 27716, *13, (E.D. Mo. Apr. 2, 2009).

[4] See WASHINGTON cases *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992) (internal citation and quotations omitted).

LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, LP, will collectively be referred to as "G6 Parent Hotel Defendants."

a. Defendant G6 Hospitality, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

b. Defendant G6 Hospitality, IP, LLC is a for profit Delaware corporation with its principal place of business in Carrollton, Texas.

c. Defendant G6 Hospitality Property, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

d. Defendant G6 Hospitality Purchasing, L.L.C., is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

e. Defendant G6 Hospitality Franchising, L.L.C. is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

f. Defendant Motel 6 Operating L.P. is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

g. G6 Parent Hotel Defendants are registered to do business in the State of California and may be served at Cogency Global Inc., 1505 Agent, Los Angeles, California 90028.

h. Upon information and belief, G6 Parent Hotel Defendants' and its brand Motel 6® properties include the Hollywood Motel 6 location at 1738 Whitley Avenue, Los Angeles, California 90028 ("Hollywood Motel 6"). At all relevant times, from 2014 to 2018, G6 Parent Hotel Defendants contracted and transacted business in Los Angeles County, California, through the Hollywood Motel 6 located at 1738 Whitley Avenue, Los Angeles, California 90028, and purposefully availed itself to Los Angeles County, California, and the citizens of Los Angeles County, California, through Motel 6®.

9. Defendant Hollywood Host Ventures, Inc., is a California corporation with its principal place of business located at 1738 Whitley Avenue, Los Angeles, California, 90028. Upon information and belief, Defendant Hollywood Host Ventures, Inc., owned, operated, and controlled the Hollywood

Motel 6 location at 1738 Whitley Avenue, Los Angeles, California 90028 during all relevant times. Defendant Hollywood Host Ventures will be referred to as the "Motel 6 Defendant."

10. Defendants Wyndham Hotels & Resorts, Inc. (WHR), Wyndham Hotel Group, LLC (WHG), and Days Inn Worldwide, Inc. (DIW) will collectively be referred to as "Wyndham Parent Hotel Defendants."

a. Defendant Wyndham Hotels & Resorts, Inc. ("WHR") is a for profit Delaware corporation with its principal place of business in Parsippany, New Jersey and can be served through its registered agent in Wilmington, Delaware.

b. Wyndham Hotels & Resorts, Inc. is the successor entity to Wyndham Worldwide Corporation. Defendant Wyndham Hotels & Resorts, Inc. retained successor liability for wrongful acts of its predecessor Wyndham Worldwide Corporation. Where applicable, references to WHR in this complaint also refer to Wyndham Worldwide Corporation.

c. Upon information and belief and all times relevant herein, Wyndham is a corporation that brands, instructs, controls, and contracts with about 9,000 branded properties for profit, including Days Inn by Wyndham located at 450 Pioneer Drive, Glendale, California 91203 (Days Inn) and Super 8 by Wyndham located at 7631 Topanga Canyon Boulevard, Woodland Hills, California 91304 (Super 8,) where JANE DOE was regularly harbored, forced and coerced to engage in commercial sex acts for the benefit of her traffickers and subject Defendants.

d. From 2014 and through 2018, Wyndham Hotels & Resorts, Inc. transacted business in Los Angeles County, California, and purposefully availed itself to Los Angeles County, California, and the citizens of Los Angeles County, California, through Days Inn by Wyndham and Super 8 by Wyndham.

e. Wyndham Hotel Group, LLC (WHG) is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. Upon information and belief, WHG is a wholly owned subsidiary of WHR and a former subsidiary of Wyndham Worldwide Corporation.

f. Upon information and belief, WHG owned, operated, managed, maintained, inspected, secured, supervised, and/or controlled the premises at Days Inn by Wyndham located at 450 Pioneer Drive, Glendale, California 91203 and Super 8 by Wyndham located at 7631 Topanga Canyon Boulevard, Woodland Hills, California 91304 where JANE DOE was regularly harbored, forced and coerced to engage in commercial sex acts for the benefit of her traffickers and subject Defendants.

g. From 2014 and through 2018, WHG transacted business in Los Angeles County, California, and purposefully availed itself to Los Angeles County, California, and the citizens of Los Angeles County, California, through Days Inn and Super 8 by Wyndham.

h. Days Inn Worldwide, Inc. ("DIW") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. Upon information and belief, DIW is a direct subsidiary of WHG, an indirect subsidiary of WHR, and a former subsidiary of Wyndham Worldwide Corporation.

i. Upon information and belief, DIW owned, operated, managed, maintained, inspected, secured, supervised, and/or controlled the premises at Days Inn by Wyndham located at 450 Pioneer Drive, Glendale, California 91203 and Super 8 by Wyndham located at 7631 Topanga Canyon Boulevard, Woodland Hills, California 91304, where JANE DOE was regularly harbored, forced and coerced to engage in commercial sex acts for the benefit of her traffickers and subject Defendants.

j. From 2014 and through 2018, DIW transacted business in Los Angeles County, California, and purposefully availed itself to Los Angeles County, California, and the citizens of Los Angeles County, California, through Days Inn and Super 8 by Wyndham.

11. Defendant CJS Corporation, is a California corporation with its principal place of business located at 12401 Raleigh Court, Northridge, California 91326. Upon information and belief, Defendant CJS Corporation, owned, operated, and controlled the Super 8 by Wyndham location at 7631 Topanga Canyon Boulevard, Woodland Hills, California, during all relevant times. Defendant CJS

Corporation will be referred to as the "Super 8 Defendant".

12. Defendant The Glendale Hotel, LLC, is a foreign LLC registered in California with its principal place of business located at 156 E Tujunga Ave, Burbank, California 91502. Upon information and belief, Defendant Glendale Hotel, LLC, owned, operated, and controlled the Days Inn by Wyndham location at 450 Pioneer Drive, Glendale, California 91203, during all relevant times. Defendant The Glendale Hotel LLC will be referred to as the "Days Inn Defendant".

13. The Wyndham Parent Hotel Defendants, Defendant CJS Corporation and Defendant The Glendale Hotel, LLC will collectively be referred to as the "Wyndham Defendants."

14. Defendant Hollywood La Brea Inn, LLC, is a California corporation with its principal place of business located at 7110 Hollywood Boulevard, Los Angeles, California 90046. Upon information and belief, Defendant Hollywood La Brea Inn, LLC, owned, operated, and controlled Hollywood La Brea Hotel located at 7110 Hollywood Boulevard, Los Angeles, California 90046 (La Brea,) during all relevant times. Defendant Hollywood La Brea Inn, LLC will be referred to as the "La Brea Defendant".

**JURISDICTION AND VENUE**

15. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the Trafficking Victims Protection Reauthorization Act ("TVPRA").

16. Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, led to injuries that occurred in the judicial district where this action is brought.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of the Los Angeles County, California, and all Defendants are registered to do business and were doing business in California.

**SEX TRAFFICKING UNDER FEDERAL LAW**

18. Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial

sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[5]

19. The requirements for liability under the TVPRA on a beneficiary theory can be stated as follows: (1) the person or entity "knowingly benefits, financially or by receiving anything of value" (2) "from participating in a venture" (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

20. "Sex trafficking" is defined by the TVPRA under 22 U.S.C. § 7102(12) as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act."

21. The term "severe forms of trafficking in persons" includes "sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age." 22 U.S.C. § 7102(11).

## FACTUAL ALLEGATIONS

### 1. The Hotel Industry Has Played a Significant Role in the Sex Trafficking Industry for Decades.

22. Human trafficking, including sex trafficking, has been prevalent at hotels and motels for decades. Hotel and motel owners, operators and controllers have known about it for decades. Traffickers have used hotels and motels to sell their victims for decades because numerous hotels and motels have knowingly allowed it to happen and failed to report or stop it so that the hotels and motels could continue to regularly profit from the room rentals.

23. For decades, numerous hotel and motel owners, operators and controllers have accommodated traffickers by accepting cash payments nightly from traffickers for extended stays; giving them two rooms next to each other so that one can be used by buyers to have their way with victims each night; giving rooms away from other guests; warning traffickers about police activity and stings; calling traffickers to come back when police have left the properties; lying to the police and public about trafficking that occurs at their properties; not reporting criminal activity and the trafficking that they observe; and participating as buyers by paying for sex with victims and/or giving traffickers rooms in

[5] 18 U.S.C. §1591; 22 U.S.C. § 7102.

exchange for sex with victims.

24. In 2017, human trafficking was noted as the world's fastest growing crime. While the term "human trafficking" incorporates all forced labor, the sex trafficking industry alone earns an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of all illegal drugs.

25. The hospitality industry plays a crucial role in the sex trade. Hotels have long profited from their reputations as havens of privacy and discretion for the offenders. Despite the known risks and known trafficking crimes, hotels, including the Defendants, have offered and continue to offer anonymity and non-traceability to the traffickers, making them ideal venues for crime and sex trafficking in particular. Hotels, including the Defendants, knowingly harbor traffickers, including sellers and buyers, and victims.

26. Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens. For years, sex traffickers have "been able to reap their profits with little risk when attempting to operate within hotels."

27. According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur. Traffickers and buyers alike frequently use hotel rooms to exploit victims.

28. In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels. Hotels have been found to account for over 90% of commercial exploitation of children.

29. Due to the overall hospitality industry's participation, complacency, complicity, negligence, intentional wrongful acts and reckless disregard related to sex trafficking, hotels are the venue of choice for sex trafficking. Traffickers and buyers capitalize on the hotel industry's general refusal to (1) adopt and enforce companywide anti-trafficking policies from the corporate to the property level, (2) train staff on what to look for and how to respond, and/or (3) establish safe and secure reporting mechanisms for those at the point of sale.

30. Every day, thousands of hotel employees witness signs of sex trafficking and commercial exploitation. Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual

exploitation where it is most likely to occur—which is on their property and in their view.

31. Hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation and should be held accountable when they fail to do so and negligently or knowingly choose to participate in the sex trade for profits. As stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."

32. Even estimates by attorneys for the hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels. The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in the hospitality industry in the United States.

33. The complicity and participation of the hospitality industry is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection by law enforcement. Sex trafficking ventures move from place to place, and usually from hotel to hotel, so that they are less visible to law enforcement. Similarly, sex traffickers also want to keep their victims moving from place to place to isolate them from any possible means of escape or rescue. Traffickers are well aware of the seclusion and anonymity attendant with booking rooms with certain hotels and hotel chains, including the hotels named in this complaint — they know it is unlikely that they will be disturbed and highly unlikely that hotels will act to protect victims. Instead, hoteliers protect traffickers and profits.

34. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

35. Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the California Attorney General, Love 146, and ECPAT, among numerous others, have established recommended policies and procedures for recognizing the signs of sex trafficking.

36. Some of the recommended policies and procedures intended to reduce or eliminate sex

trafficking, which Defendants have been aware of or should have been aware of since before Plaintiff was trafficked, are specific to the hotel industry. These include learning to identify warning signs and indicators of sex trafficking so that it can be stopped. Signs include but are not limited to:

a. Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;
b. Individuals show signs of physical abuse, restraint, and/or confinement;
c. Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;
d. Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;
e. Individuals lack freedom of movement or are constantly monitored;
f. Individuals avoid eye contact and interaction with others;
g. Individuals have no control over or possession of money or ID;
h. Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;
i. Individuals have few or no personal items—such as no luggage or other bags;
j. A group of girls appears to be traveling with an older female or male;
k. A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;
l. Drug abuse or frequent use of "party drugs" such as Fentanyl, GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;
m. Possession and presence of bulk sexual paraphernalia such as condoms or lubricant;
n. Possession or use of multiple cell phones;
o. Possession or use of large amounts of cash or pre-paid cards;
p. Inability to come and go freely from the hotel;
q. People watching others from vehicles or by loitering around the premises;
r. Solicitation in and around the hotel;
s. Money exchanged in common areas, including hallways, lobbies, and parking lots;
t. Women dressed provocatively and accompanied by men;

u. Men or women with weapons;

v. Multiple non-guest men coming in and out of a particular hotel room;

w. Signs of injury on men or women whom seem to be controlled or watched by others;

x. Sexual supplies including lubricants and devices in rooms visible to cleaning staff;

y. Towels with blood;

z. Excess towels and sheet requested per night;

aa. Excessive condoms in trash taken by cleaning staff;

bb. Signs of verbal and physical abuse, including yelling, screaming, and signs of physical injury;

cc. Women appearing to be under the influence of drugs or alcohol while being transported in and out of the hotel or taken from room to room;

dd. Asking for rooms away from other guests;

ee. Asking for rooms with separate entrances/exits that can be propped open for non-guests;

ff. Paying cash on a nightly basis or in increments for extended periods of time;

gg. Paying with stolen credit cards; and

hh. Paying with credit cards online that are not in hand or do not have a matching ID.

37. At all times of trafficking alleged herein, Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking and should have seen signs of the sex trafficking of Plaintiff that were observed by and observable by Defendants.

38. Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, including the subject properties where Plaintiff was trafficked, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of the hotels.

39. Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, brands, owners, operators and employees can identify and respond to this

trafficking, it has become apparent that the decision of Defendants to continue generating revenue from traffickers without taking reasonable steps to identify and prevent trafficking in its hotels, is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

40. The United States is ranked one of the worst countries in the world for human trafficking according to a 2019 report released by the Department of State.

41. The decades-old problem still exists, and defendants are still participating in sex trafficking ventures despite misleading public statements to the contrary.

42. In 2014, Wyndham President and CEO, Geoff Ballotti, made a public statement: "With 7,590 hotels across 71 countries, Wyndham Hotel Group has the unique opportunity to make a meaningful and transformational impact on how the hotel industry contributes to the prevention of human trafficking… Our partnership with Polaris allows us to act upon our commitment to doing the right thing by educating and preparing our employees and franchisees to identify and help prevent human trafficking."

43. In 2019, in response to a lawsuit filed against Wyndham for facilitating sex trafficking, Wyndham released a public statement discussing its management of its hotels and knowledge about sex trafficking: "We condemn human trafficking in any form," Wyndham Hotels & Resorts said in a statement. "Through our partnerships with the International Tourism Partnership, ECPAT-USA, Polaris Project and other organizations that share the same values, we have worked to enhance our policies condemning human trafficking while also providing training to help our team members, as well as the hotels we manage, identify and report trafficking activities."

44. In 2020, Wyndham Chief Executive Officer, Geoff Ballotti said: "We condemn human trafficking in any form," and "[i]n recognition of National Slavery and Human Trafficking Prevention Month, we want to reinforce our partnerships with Polaris and other important anti-trafficking organizations, while continuing to educate the hospitality community on how to help identify and report trafficking activities." Wyndham stated in a press release that it "mandates human trafficking training for all company employees globally." Thus, Wyndham knew and should have known about all red flags of sex trafficking in hotels.

45. In 2020, Wyndham Hotels & Resorts, Inc. was listed as one of twelve organizations on

watchdog group, National Center on Sexual Exploitation 's "Dirty Dozen List" as a major long-time contributor to sexual exploitation, which noted Wyndham's long history of policies protecting sex traffickers and its refusal to remove paid pornography that showed exploited minors from its televisions. The list and allegations against Wyndham were widely spread in the news.

46. Wyndham currently boasts on its website, "From combating human trafficking—which we do through team member and franchisee training as well as partnerships with organizations like BEST, Polaris, and PACT—to making contributions to worthy charities, we've seen first-hand that we do well by doing good." Yet, Wyndham continues to knowingly profit from sex trafficking at its properties to this day.

**2. <u>Defendants Participated in a Sex Trafficking Venture that Involved Abusing and Trafficking Plaintiff by Force and Coercing Plaintiff to Engage in Commercial Sex for Their Benefit.</u>**

47. Plaintiff is an adult woman who was trafficked for commercial sex from 2014 until 2018. During this time, Plaintiff was trafficked at numerous hotel locations throughout Los Angeles County, California, including: Days Inn By Wyndham located at 450 Pioneer Drive, Glendale, California 91203; Super 8 By Wyndham located at 7631 Topanga Canyon Boulevard, Woodland Hills, California 91304; Hollywood Motel 6 located at 1738 Whitley Avenue, Los Angeles, California 90028; and Hollywood La Brea Hotel located at 7110 Hollywood Boulevard, Los Angeles, California 90046.

48. Plaintiff initially met her traffickers through social media and mutual connections, during which she was led to believe that at least one trafficker intended to pursue a romantic relationship with her.

49. Plaintiff 's traffickers subjected Plaintiff to physical violence and coercion, including striking her when she refused to comply with his demands. The traffickers controlled Plaintiff's activities, required her to engage in commercial sex acts, and utilized online platforms, including Backpage and Redbook, to advertise her for commercial sex.

50. Plaintiffs' traffickers would utilize Redbook and Backpage to advertise, then force Plaintiff to perform commercial sex acts at the subject hotel locations; subjecting her to escalating physical violence.

51. Plaintiff's traffickers constantly monitored her every move and forced her to perform commercial sex acts against her will to meet a daily and weekly monetary quota. If Plaintiff did not follow her traffickers' orders and meet her quotas, her traffickers threatened and used violence and punishments.

52. Plaintiff was repeatedly raped every day while her traffickers kept all the money from the forced commercial sex acts. Each day at the subject hotel properties, male buyers entered and exited her room for commercial sex acts. These activities occurred alongside numerous well-known indicators of trafficking, including:

a. Cash payments for short-term and extended stays;
b. Frequent male visitors to the same room;
c. Requests for excessive linens and the presence of large quantities of condoms;
d. Visible physical abuse and loud disturbances;
e. Drug use and signs of coercion; and
f. Plaintiff living out of hotel rooms for extended periods.

53. Hotel staff at the subject locations observed, were aware of, or willfully ignored clear indicators of trafficking. Staff at these locations maintained familiarity with traffickers and permitted ongoing trafficking activity despite repeated red flags.

54. Plaintiff was trafficked at the Hollywood Motel 6 from approximately 2015 to 2017, staying frequently for months at a time. During Plaintiff and her traffickers' stays at the Hollywood Motel 6, G6 staff witnessed red flags of Plaintiff's trafficking:

a. One of Plaintiff's traffickers dragged Plaintiff out of the hotel room by her hair and pushed her down the stairs directly in front of G6 staff members and hotel guests. Despite witnessing this incident, the G6 staff did not intervene.
b. G6 staff allowed Plaintiff and her trafficker to pay for stays in cash.
c. Plaintiff's traffickers frequented this location often because they knew the location turned a blind eye to trafficking occurring on their property. Plaintiff recalls other victims being present at the property during her stays, as well as police frequently patrolling the parking lot.

d. During stays at the Hollywood Motel 6, Plaintiff's traffickers were violent with her in the hotel room, which resulted in loud yelling and sounds of abuse coming from the hotel room. When Plaintiff refused to perform commercial sex, one of Plaintiff's traffickers beat punched her in Hollywood Motel 6 hotel room and then proceeded to hit her repeatedly on the head with a metal hanger.

e. The G6 employees would notify Plaintiff and her trafficker when law enforcement was coming. Plaintiff recalls a hotel staff member warning her that police were coming to do a sting and telling her to "watch out."

f. The Hollywood Motel 6 staff also accepted bribes from Plaintiff's trafficker to look the other way while Plaintiff was being trafficked on the property.

g. G6 employees knew Plaintiff's traffickers by name and appeared to be on friendly terms with them.

55. Plaintiff was trafficked at the Days Inn by Wyndham from approximately 2015 to summer of 2016, staying frequently for months at a time. During Plaintiff and her traffickers' stays at the Days Inn, Wyndham staff witnessed red flags of Plaintiff's trafficking:

a. Wyndham staff at the Days Inn would notify Plaintiff and her traffickers when police raids were coming.

b. Wyndham staff always allowed Plaintiff and her trafficker to request rooms away from other guests

c. There would be loud altercations and sounds of abuse coming from Plaintiff's room, which would have been obvious to hotel staff and other guests.

56. Plaintiff was trafficked at the Super 8 by Wyndham during the year of 2014, staying frequently for days at a time. During Plaintiff and her traffickers' stays at the Super 8, Wyndham staff witnessed red flags of Plaintiff's trafficking:

a. Plaintiff recalls the owners of the Super 8 were an Asian family. The owners witnessed signs of trafficking at this location, including male buyers coming to and from Plaintiff's room at all hours of the day and night, sex and drug paraphernalia being

left behind in the rooms, women wearing clothing inappropriate for the weather, and louds sounds of yelling and abuse coming from Plaintiff's room.

b. Plaintiff was physically abused by her traffickers and his associates in public areas of the Super 8.

57. Plaintiff was trafficked at the Hollywood La Brea Inn from approximately 2015 to 2018, staying frequently for days or weeks at a time. During Plaintiff and her traffickers' stays at the La Brea, staff witnessed red flags of Plaintiff's trafficking:

a. At the Hollywood La Brea Inn, one of the most frequent locations used by Plaintiff's traffickers, staff and management placed Plaintiff in the same secluded corner room near the jacuzzi and maintained surveillance cameras with monitors at the front desk. The video surveillance captured the constant stream of male buyers in and out of Plaintiff's room. Hollywood La Brea employees tipped off Plaintiff's traffickers of impending police raids. When Plaintiff sought help, Hollywood La Brea staff did not intervene and allowed her trafficking to continue.

b. Plaintiff was raped, drugged, and robbed by a male buyer at this hotel location. One of her traffickers returned and realized the money was gone, so he brutally beat her in the hotel room.

c. Later that same day at La Brea Inn, while showering, Plaintiff observed a man watching her through the bathroom window facing a rear alley; she fled the room barefoot and in a towel to the front desk, where staff again refused to help, and a hotel guest ultimately allowed her to use a phone where she called her parents and was finally able to escape.

58. Throughout the trafficking period, Plaintiff was controlled through a combination of physical violence, threats, psychological abuse, monitoring of her communications, confiscation of identification and property, and the taking of her earnings. Traffickers also maintained access to Plaintiff's social media accounts and posted content to advertise her and normalize the appearance of her situation.

59. Across these named locations, obvious and repeated indicators of sex trafficking were

present and observable to hotel staff, including: rooms rented in Plaintiff's own name with her photo ID; cash payments and day-by-day extensions; requests for rooms away from other guests; heavy, continuous foot traffic by male visitors; visible injuries and public altercations; frequent linen changes; large quantities of condoms; "do not disturb" requests; loitering/soliciting on hotel premises; and staff warning about impending police stings or otherwise looking the other way.

60. As a direct and proximate result of Defendants' conduct and the trafficking described herein, Plaintiff has suffered significant physical, emotional, and psychological harm.

61. Plaintiff has experienced trauma-related conditions, including anxiety, depression, and post-traumatic stress symptoms, as well as significant disruptions to her physical health, relationships, employment, and education.

**3. <u>Motel 6 Defendants Knew About and Participated in the Sex Trafficking Venture of Plaintiff and Others at the Subject Motel 6 Location.</u>**

62. Motel 6 Defendants had both actual and constructive knowledge of the trafficking of Plaintiff at the subject Motel 6 location they owned and operated because the trafficking was the direct result of Motel 6 Defendants' facilitation of Plaintiff's trafficking at the subject location.

63. From 2014 until 2018, the G6 Parent Hotel Defendants and Motel 6 Defendant owned and operated Hollywood Motel 6 located at 1738 Whitley Avenue. The G6 Parent Hotel Defendants knew that Plaintiff and other women were being trafficked for sex at this location and directly observed, overheard, and witnessed the same by and through their agents, managers, and employees from 2014 through 2018, as well as before and after. G6 Parent Hotel Defendants, by and through Motel 6 Defendant knew and should have known that Plaintiff was being trafficked regularly at the subject Motel 6 properties.

64. The G6 Parent Hotel Defendants and Motel 6 Defendant are responsible for the acts, omissions, and knowledge of all employees of the subject hotel location when operating the hotel because these acts and omissions were committed in the course and scope of employment. The Defendants ratified these acts and omissions because each failed to exercise reasonable care in the hiring, training, supervision, and retention of these employees given the specific risks known and reported to the Defendants of sex trafficking occurring that the subject location.

65. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject locations, including the trafficking of Plaintiff, Defendants continued renting rooms for profit to these traffickers, including the rooms used to sexually exploit victims.

66. The G6 Parent Hotel Defendants and Motel 6 Defendant also facilitated widespread trafficking at their motel locations, including the trafficking of Plaintiff in ways including:

a. Allowing inappropriate and inadequate practices for hiring, training, supervising, managing, retaining, and disciplining front line staff regarding issues related to human and sex trafficking;

b. Inadequate and inadequately enforced sex trafficking notice and training for motel staff;

c. Choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, laws, and/or applicable franchisor policies and procedures and its own claimed policies and procedures so as to support an environment without accountability; and

d. Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the motel staff and openly traffic women and children with the motel staff's assistance.

67. Upon information and belief, during the times Plaintiff was trafficked at the subject property, G6 Parent Hotel Defendants participated directly in aspects of the daily operations of the subject hotel that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Plaintiff as follows:

a. G6 Parent Hotel Defendants assumed responsibility and control over the human trafficking response of their subject motel property, including but not limited to design, implementation, and mandates of practices related to trafficking, safety and security procedures, employee and franchisee education, training and response, partnership with external organizations, security, reporting, and advocacy;

b. G6 Parent Hotel Defendants retained control over when its branded motels would share information with law enforcement and when law enforcement would be contacted about

suspected criminal activity in their branded motel locations;

c. G6 Parent Hotel Defendants retained control over determining which motels needed additional training or other resources based on the risk of trafficking occurring and other related criminal activity;

d. G6 Parent Hotel Defendants retained control to terminate hotel staff and/or a franchising agreement based on the response to human and sex trafficking;

e. G6 Parent Hotel Defendants determined whether the training was provided, when it was provided, the content of the training, how the training was delivered, who received it, and the consequences of someone not participating in or failing to follow such training;

f. G6 Parent Hotel Defendants retained control over setting, supervision, overseeing, and enforcement policies and procedures for housekeeping services at the subject motel location, including how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

g. During the time Jane Doe was trafficked at 1738 Whitley Avenue, Los Angeles, California 90028, Motel 6 Defendant directly owned and operated the motel, and the remaining G6 Parent Hotel Defendants also controlled the day-to-day operations.

68. As a direct and proximate result of these egregious practices on the part of the G6 Parent Hotel Defendants and Motel 6 Defendant, Plaintiff and numerous other victims of sex trafficking and exploitation have been permanently injured and damaged physically, emotionally, psychologically, and financially.

69. Defendants' knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. Defendants have known, since well before Plaintiff was trafficked, that sex trafficking was ongoing and widespread at their branded properties, including the subject properties named herein.

70. Use of the G6 Parent Hotel Defendants and Motel 6 Defendant's branded properties for sex trafficking is well known to Defendants. Upon information and belief, before and at the time Plaintiff was trafficked at the subject Motel 6 property, each of the G6 Parent Hotel Defendants and Motel 6

Defendant monitored criminal activity occurring at the branded hotels and were aware of activity indicating commercial sex, sex trafficking, and related crimes occurring at those branded hotels, including the specific Motel 6 property where Plaintiff was trafficked.

71. Defendants knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their brand properties, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; not requiring identification cards or "IDs"; allowing daily payments of cash for extended stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms without IDs; allowing several buyers to come in and out of the rooms victims were trafficked in without ID; ignoring yelling and screaming from rooms where trafficking took place; ignoring obvious copious amounts of sex paraphernalia; not addressing the trafficking signs and reports of drugs, abuse and prostitution; forming relationships with traffickers and treating traffickers like "regulars" with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking or taking any steps to prevent or stop it.

72. Defendants have access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

73. Information that has become public through news stories establishes the entrenched and pervasive nature of Defendants' role in providing a venue where sex trafficking has continued unabated for several years. Defendants have provided the means necessary for traffickers to traffic victims, including Plaintiff.

74. During the period Plaintiff was trafficked at the subject locations named herein, there were obvious signs that her traffickers were engaged in sex trafficking and those signs were on display consistently to The G6 Parent Hotel Defendants and Motel 6 Defendant.

75. Plaintiff's traffickers were often present with Plaintiff at check in and would linger around the hotel or in the parking lot while Plaintiff was forced to have sex with buyers at the subject hotels. Plaintiff would look scared, timid, nervous, abused, battered and sad. This was all in plain sight of

Defendants' employees at the subject location.

76. There was heavy foot traffic in and out of the rooms where Plaintiff was being harbored. This foot traffic involved men who were not hotel guests. Several men came in and out of the subject hotel rooms in a single day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time. Their comings and goings were visible to hotel employees that were located at front desk and around the Motel 6 property. A reasonable hotel would have seen these regular "red flag" interactions at their property in plain sight and Defendants should have seen and did see it by and through their employees and agents.

77. There were obvious signs of trafficking consistent with sex trafficking, and which included well known "red flags" for trafficking in a hotel, such as condoms, sex paraphernalia, foot traffic, loitering, lingering, money exchanges, abuse, excess bedding and towels, bloody bedding and towels, and lingerie. These things were not only visible to but must have been seen by hotel employees entering and cleaning the rooms or even just collecting the trash, towels and linens.

78. When forced and coerced into coming and going from the subject motel locations, Plaintiff looked unhealthy, unhappy, abused, and scared. Her traffickers were always watching her, and her noticeable demeanor was visible to hotel employees they passed by.

79. Upon information and belief, at all times relevant, multiple employees at the subject Motel 6 location named herein, including management-level and parent company employees observed, or were made aware of, these obvious signs of trafficking while acting within the scope and course of their employment.

80. As such, Defendants knew or were willfully blind to the fact that Plaintiff was being trafficked at the subject Motel 6 location named herein. A jury will likely find that they knew and at the very least, should have known.

81. Before and during the time Plaintiff was being trafficked at the Hollywood Motel 6 location, The G6 Parent Hotel Defendants and Motel 6 Defendant were aware of the widespread use of their motels for human trafficking. For instance, as far back as 2013, another Motel 6 location in Los Angeles became such a hub for human trafficking and other criminal activity that G6 Parent Hotel Defendants paid to settle a public nuisance lawsuit related to such trafficking filed by the City of Los

Angeles.[6]

82. The Los Angeles nuisance settlement required G6 Parent Hotel Defendants to change policies that were facilitating sex trafficking.[7] G6 Parent Hotel Defendants knew from that lawsuit, from many prior lawsuits, and from their personal knowledge about sex trafficking at their properties that their policies were facilitating sex trafficking. Based on information and belief, at all times relevant in this Complaint and currently, G6 Parent Hotel Defendants and Motel 6 Defendant failed to, at the time Plaintiff was trafficked and still failed to adequately implement and enforce such changes.

83. Public statements of G6 Parent Hotel Defendants confirm that they knew before and during the sex trafficking of Plaintiff that sex trafficking is a problem in the hotel industry, sex trafficking was occurring at their branded hotels, and that they retained control over the response of their branded hotels to this problem. G6 Parent Hotel Defendants recognized that "[t]raffickers often use hotels and motels for sex trafficking activities due to the privacy extended to guests."[8] They also acknowledged the significant role G6 Parent Hotel Defendants have in the three D's: deterring, detecting, and disrupting sex trafficking in their branded hotels.[9]

84. G6 Parent Hotel Defendants acknowledge on its website that it controls the policies, procedures, training, and codes of conduct that have facilitated sex trafficking at its Motel 6 Brand motels, including the subject Hollywood Motel 6 property where Plaintiff was trafficked and abused regularly.[10]

85. G6 Parent Hotel Defendants acknowledge on its website that it did and does control the policies, procedures, training, and codes of conduct that have facilitated sex trafficking at its branded hotels.[11]

86. Among some of the notable press involving frequent use of Motel 6 and other G6 hotels for illegal trafficking activity, the following was noted:

---

[6] Motel 6 pays $250,000 to settle human trafficking suit (Aug. 31, 2017), https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/.

[7] *Id.*

[8] G6 HOSPITALITY ANTI-HUMAN TRAFFICKING TRAINING, http://g6propertycollateral.com/wp-content/uploads/2020/02/G6_TheRoomNextDoor_Training_V12b_NoFacilitator.pdf

[9] *Id.*

[10] https://g6hospitality.com/combating-human-trafficking/

[11] *Id.*

a. In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten (10) times per day.[12]

b. In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[13]

c. In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[14]

d. From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[15]

e. Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[16]

f. The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[17]

g. The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California.[18]

h. Two men were arrested in March 2015 for sex trafficking a fifteen (15) year old girl at Motel 6 in Austin, Texas.[19]

---

[12] Amy Fine Collins, Sex Trafficking of Americans: The Girls Next Door, Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105

[13] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.

[14] Mark Reiter, Two Toledoans Accused Of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html

[15] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usaondil/file/813771/download.

[16] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims.

[17] FBI Investigates Human Trafficking At Madison Hotel, WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.

[18] Suspects Busted in Anaheim Sex Ring, ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784.

[19] Lindsay Bramson, Local Teen Saved from Sex Slavery; Two Charged, KXAN Austin (Mar. 6, 2015), https://www.kxan.com/news/local/austin/local-teen-freed-from-sex-slavery-two-charged/1049580764.

i. In March 2015, police arrested a man for sex trafficking a runaway seventeen (17) year old at a Motel 6 in Warwick, Rhode Island.[20]

j. Over a fourteen (14) month period ending in approximately April 2015, at the same Motel 6 in Warwick, Rhode Island had seventy-five (75) arrests on its property for crimes including sex-trafficking.[21]

k. Seven (7) people were indicted in January 2016, by a Colorado grand jury for sex trafficking children from 2014 through the summer of 2015, out of hotels in Denver, Colorado, including a Denver area Motel 6.[22]

l. In the summer of 2015, a woman was arrested at a Motel 6 in Great Falls, Montana where she was involved in sex trafficking a seventeen (17) year old girl.[23]

m. A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[24]

n. In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[25]

o. In approximately July 2015, sex traffickers sold a fifteen (15) year old girl for sex at a Motel 6 in Pismo Beach, California.[26]

---

[20] Amanda Milkovits, Massachusetts Man Accused of Trafficking Teen In Warwick Motel, NewportRI.com (Mar. 24, 2015), https://www.newportri.com/article/20150324/NEWS/150329666.

[21] Sarah Kaplan, Crime-Ridden Motel 6 In R.I. Will Hand Over Guest List To Police, The Washington Post (Apr. 28, 2015)https://www.washingpost.com/news/morning-mix/wp/2015/04/28/crime-ridden-motel-6-in-r-i-will-hand-over-guest-list-to-police/?utm_term=.a804ce3f32a8.

[22] Hsing Tseng, Seven Indicted by Colorado Grand Jury In Child Sex Trafficking Ring Bust, Fox 31 Denver (Jan. 6, 2016), https://kdvr.com/2016/01/06/7-indicted-by-colorado-grand-jury-in-child-sex- trafficking-ring-bust/.

[23] Andrea Fisher, Woman Caught Up In Human Trafficking Ring Pleads Guilty (Aug. 29, 2016), https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleads-guilty/89566374/.

[24] Diana Hefley, County Investigating 45 Ongoing Human Sex Trafficking Cases, Herald Net (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

[25] Tuscaloosa Man Charged With Rape And Trafficking Mississippi Teen, News Mississippi (Nov. 7, 28 2014), https://newsms.fm/tuscaloosa-man-charged-human-trafficking-mississippi-teen/.

[26] Matt Fountain, Four Accused Of Pimping Out 15-Year-Old Girl In SLO Will Stand Trial, SanLuisObispo.com (May 5, 2016), https://www.sanluisobispo.com/news/local/article75832962.html.

p. In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[27]

q. Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[28]

r. In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013 and charged with sex trafficking of two young women.[29]

s. In 2019, two different men were arrested within a week of one another and charged with sex trafficking a woman and a child out of a Seattle Washington Motel 6—one of victims was just fourteen (14) years old.[30]

87. This sampling of news stories, reviews, and other public information establishes that, at the time Plaintiff was trafficked at the subject properties, G6 Parent Hotel Defendants and Motel 6 Defendant knew or should have known at all relevant times that:

a. There was widespread and ongoing sex trafficking occurring at the G6 branded properties, including at the subject Motel 6 where Plaintiff was being trafficked;

b. Sex trafficking was a brand-wide problem for G6 Parent Hotel Defendants;

c. G6 franchisees and hotel staff, including Motel 6 Defendant and their employees, were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking and harboring traffickers and victims at the branded hotel properties; and

d. G6 Parent Hotel Defendants and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

88. The G6 Parent Hotel Defendants and Motel 6 Defendant were specifically aware that sex trafficking was widespread and ongoing at the subject Motel 6 location from 2015 to 2016.

---

[27] Danielle McLean, What Drives Maine Sex Traffickers' Inhumanity, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex- traffickers-inhumanity/.

[28] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.

[29] UPDATE: Man Arrested For Sex Trafficking, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.

[30] Prosecutor: SeaTac Motle 6 Used for Sex Trafficking, KIRO 7 News Seattle, (May 17, 2019), https://www.kiro7.com/news/local/prosecutor-seatac-motel-6-used-for-sex-trafficking/94906749/.

89. Internet reviews for the subject Hollywood Motel 6 location, which G6 Parent Hotel Defendants and Motel 6 Defendant read, managed, controlled, and monitored, show the pervasiveness of crime including sex trafficking before, during and after Plaintiff was trafficked. Here are just a few examples:

a. A 2012 Yelp Review stated, "Our towels had blood[ ] stains on them… As enjoyable as a 4am hooker fight outside your room can be it was not so enjoyable when all you want is some shut eye… parking is no longer free like before. Now your have to pay $10 a night… And could not leave the window open due to the gang/hooker meeting outside our window every night."[31]

b. A 2013 Yelp Review stated, "The staff is horrible, doesn't keep control of the place and charges you for everything. If you want to be surrounded by pot smoke, prostitutes, burns and aggressive dogs, then this is your place!"[32]

c. A 2014 Yelp Review stated, "The front desk people are a******* but you would be to dealing with tourist, drunks, tweek'rs, an hookers everyday all day…"[33]

d. A 2015 Yelp Review stated, "Tons of pounding from the floors above all night long… And they allow hookers and pimps do their thing in the lobby and out front of the hotel"[34]

e. A 2016 Yelp Review stated, "On my way out I witnessed a drug deals outside the lobby (purchase and exchange), and a man being arrested 75 feet away… On the way back the man being arrested was still being frisked, and I witnessed another exchange of drugs, right in front of the police."[35]

f. A June 2017 Yelp Review stated, "They allowed hookers and pimps sit on their steps and this was the first hotel I've ever stayed at that the maids had a bio-hazard box on their cleaning carts full of needles!"[36]

g. An August 2017 Yelp Review stated, "First off the walls are very thin so everytime

[31] https://www.yelp.com/biz/motel-6-los-angeles-2
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*

someone is talking, yelling and even screaming you feel as if they are right next to you… Its really annoying hearing customers coming in and out of the room in the middle of the night…” [37]

h. A September 2017 Yelp Review stated, “There’s something that looks like semen dripping off the ac.”[38]

i. A May 2018 Yelp Review stated, “Seriosly the front desk staff do not care if a woman wakes you up at midnight screaming bloody murder for 10 minutes.”[39]

j. 2023 Yelp Review “Not a safe location with what looks like hookers and homeless out front.”[40]

k. A 2018 Google Review stated, “Hookers were in the hotel lobby offering their services in the lobby by the coke and candy machines.”[41]

l. Another 2018 Google Review stated, “Housekeepers had a bio hazard bin on their cart! There were hookers and pimps sitting on the steps outside of the motel…”[42]

m. Yet another 2018 Google Review stated,” Also prostitutes were hanging out in the hallway, and loud sex was heard throughout the night.”[43]

n. A 2017 Google Review stated, “There were wehat looked like homeless people, derug dealers& hookers in the lounge area and out front of the building.”[44]

o. A 2010 Trip Adviser review stated, “Literally a druggie hooker sat oin the steps the entire 24 hours we were [there]… the staff desk and some girl were outside telling the hooker not to ask a certain girl for money cause her family owns the chain and is a Russian

---

[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] google.com/travel/search?q=738%20Whitley%20Ave%2C%20Los%20Angeles%2C%20CA%2090028%20motel%206&g2lb=4965990%2C72471280%2C72560029%2C72573224%2C72647020%2C72686036%2C72803964%2C72882230%2C72958624%2C73059275%2C73064764%2C121529350%2C121608705%2C121645060&hl=en-US&gl=us&ssta=1&ts=CAEaRwopEicyJTB4ODBjMmJmM2NiZGNkMGJlZjoweDNjZWM5OTA4NTI4ZDUwYjgSGhIUCgcI6g8QBxgXEgcI6g8QBxgZGAIyAhAA&qs=CAEyE0Nnb0l1S0cxbElXaHB2WThFQUU4AkIJCbhQjVIImew8QgkJuFCNUgiZ7Dw&ap=ugEHcmV2aWV3cw&ictx=111&ved=0CAAQ5JsGahcKEwiooIP_lpSUAxUAAAAAHQAAAAAQBA
[42] *Id.*
[43] *Id.*
[44] *Id.*

mobster n 'if she want u offed u will be.'"[45]

p. Another 2010 Trip Advisor Review stated, "there were hookers you could hear doing the dirty all night."[46]

q. A 2006 Trip Advisor Review details that the staff allowed sex trafficking victims to call other hotel patrons directly, "We get a phone call about 8:00am… it was a hooker, asking if we needed some company. Since my husband picked up, she thought he might be by himself in the room."[47]

90. The G6 Parent Hotel Defendants and Motel 6 Defendant knew Plaintiff was being trafficked at the location named herein by the many red flags present during her regular continued stays. Plaintiff's traffickers paid for stays in cash, oftentimes were not required to present ID, paid for extended stays on a day-to-day basis, requested rooms away from other guest and/or the front desk, obvious signs of illegal drug use, obvious visible signs of physical abuse, men waiting out of the room while other men were inside with Plaintiff for short periods of time, money exchanges throughout the property, solicitation around the property, and people coming and going constantly whom were not hotel guests.

91. G6 Parent Hotel Defendants are vicariously liable for the acts, omissions, and knowledge of the Motel 6 Defendant and staff of the Motel 6 location named herein, which are G6 Parent Hotel Defendants' actual agents or subagents.

92. Upon information and belief, it is a standard practice in the hospitality industry, followed by all Defendants herein, for parent and brand companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that are placed on the beds, to the types of payments accepted, how crime is prevented or dealt with if at all, and to when, where, and how guests are greeted.

93. G6 Parent Hotel Defendants provide their Motel 6 Defendant and other franchisees with signage on, throughout and in front of the building. This is done to assure customers that when they check in, they can expect an experience consistent with the standards of the G6 and Motel 6 brand. This

---

[45] https://www.tripadvisor.com/Hotel_Review-g32655-d240151-Reviews-Motel_6_Los_Angeles_Hollywood-Los_Angeles_California.html

[46] *Id.*

[47] *Id.*

brand logo is displayed on everything in the hotel, such as on materials on the bedside table and staff uniforms worn at the front desk during check-in. This was the case for the subject Hollywood Motel 6 location during the trafficking of Plaintiff.

94. G6 Parent Hotel Defendants provide their hotel branded locations brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online agency databases. They also provide access to their brand-wide central reservation systems, 800 numbers, reporting numbers, online review systems, revenue management tools, brand loyalty programs, and company websites. Therefore, bookings and room reservations are primarily controlled by G6 Parent Hotel Defendants.[48]

95. G6 Parent Hotel Defendants subject franchisees and Motel 6 Defendant to detailed standards and requirements regarding the operation of the subject Motel 6 location named herein through the franchising agreements, detailed written policies and manuals and through other formal and informal protocols, directives, mandates, reporting requirements, and expectations imposed by the G6 Parent Hotel Defendants. These mandates are drafted and within G6 Parent Hotel Defendant's power and control to require and mandate in order to do business with whomever they choose. This was also the case from 2014 to 2018, and before and after.

96. Upon information and belief, G6 Parent Hotel Defendants require their branded properties to use a property management system and did so at all relevant times. This system is linked to the G6 Parent Hotel Defendants' corporate network and data center. This is to, among other things, receive reservations, manage clientele information, manage stay information, and process payment transactions.

97. Upon information and belief, per the relevant franchise agreements, G6 Parent Hotel Defendants, at all relevant times and currently, may enforce their brand standards through periodic and regular inspections of the hotel locations, backed up with the ultimate threat of termination of the agreement.[49]

---

[48] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), The Origins and Growth of Franchising in the Hotel Industry (lodgingmagazine.com).

[49] Many of the franchise disclosure documents, which outline the policies and procedures of franchise agreements can be accessed publicly on https://fddexchange.com/view-fdd-docs.

**4. <u>Defendant Hollywood Host Ventures LLC (Motel 6 Defendant) and Staff Acted as Actual Agents of the G6 Parent Hotel Defendants</u>**

98. G6 Parent Hotel Defendants are vicariously liable for the acts, omissions, and knowledge of their Motel 6 Location and Motel 6 Defendant, and staff of the location named herein, which are G6 Parent Hotel Defendants' actual agents or subagents.

99. G6 Parent Hotel Defendants subjected Motel 6 Defendant to detailed standards and requirements regarding the operation of the Motel 6 location named herein through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, reporting, demands and expectations imposed by the G6 Parent Hotel Defendants.

100. G6 Parent Hotel Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that G6 Parent Hotel Defendants imposed on the franchisees:

a. Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Motel 6 Defendant used at their Motel 6 locations;

b. Covered virtually all aspects of hotel operations, including internal operating functions and day to day operations;

c. Dictated the specific manner in which Motel 6 Defendant and hotel staff must carry out most day-to-day functions at their Motel 6 location; and

d. Significantly exceeded what was necessary for G6 Paren Hotel Defendants to protect its registered trademarks.

101. In addition to the ways described above, upon information and belief, G6 Parent Hotel Defendants exercised and reserved the right to exercise systemic and pervasive control over Motel 6 Defendant' day-to-day operation of the subject Motel 6 location named herein, including the following ways:

a. G6 Parent Hotel Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing

basis. They retained control to mandate the trainings, and they either completed the trainings and mandated completion or they knowingly and willingly chose not to enforce the mandate despite actual knowledge of sex trafficking at this specific Motel 6 location before and during Plaintiff's trafficking. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for G6 Parent Hotel Defendants to protect their registered trademarks;

b. G6 Parent Hotel Defendants provided training for hotel management and select hotel staff on-site at the Motel 6 location selected by G6 Parent Hotel Defendants;

c. G6 Parent Hotel Defendants required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

d. G6 Parent Hotel Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. G6 Parent Hotel Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that franchisees were required to purchase to operate the Motel 6 location named herein, G6 Parent Hotel Defendants designated approved vendors and prohibited franchisees from purchasing goods and services from anyone other than an approved vendor;

g. G6 Parent Hotel Defendants required franchisees to sign a technology agreement governing the terms under which franchisees must procure and use technical services and software while operating the Motel 6 location named herein. Motel 6 Defendant was required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel, including related to security;

h. G6 Parent Hotel Defendants set required staffing levels for the Motel 6 location named herein;

i. G6 Parent Hotel Defendants established detailed job descriptions for all positions in its

Motel 6 properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j. G6 Parent Hotel Defendants set requirements for the hiring process used by franchisees and oversaw employee discipline processes and decisions;

k. G6 Parent Hotel Defendants provided benefits for employees of franchised hotels;

l. G6 Parent Hotel Defendants required Motel 6 Defendant to use a customer resource management program maintained and operated by the G6 Parent Hotel Defendants;

m. G6 Parent Hotel Defendants controlled channels for guests to report complaints or provide feedback regarding the Motel 6 location and directly participated in the response and/or supervised the response to customer complaints or other feedback. G6 Parent Hotel Defendants retained the right to provide refunds or other compensation to guests and to require Motel 6 Defendant to pay associated costs;

n. G6 Parent Hotel Defendants generated reports and analysis of guest complaints and online reviews for the subject Motel 6 location;

o. G6 Parent Hotel Defendants required Motel 6 Defendant to use a Guest Relations Application owned, operated, and maintained by G6 Parent Hotel Defendants to manage all guest data and information. G6 Parent Hotel Defendants could use the backend of this system to analyze data and generate reports;

p. G6 Parent Hotel Defendants set detailed requirements for insurance that franchisees must purchase and retain the right to purchase insurance for franchisees and to bill franchisees directly for that insurance if G6 Parent Hotel Defendants determine that the franchisees have not purchased adequate insurance;

q. G6 Parent Hotel Defendants regularly audited and had access to the books and records of Motel 6 Defendant;

r. G6 Parent Hotel Defendants conducted frequent and unscheduled inspections of Motel 6 properties, including the Motel 6 location named herein;

s. G6 Parent Hotel Defendants retained the right to issue fines, require additional training,

to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreements if franchisees violated any of the G6 Parent Hotel Defendants' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Motel 6 location named herein and the prevention or response to any crimes including sex trafficking;

t. G6 Parent Hotel Defendants controlled all marketing for subject Motel 6 location and prohibited franchisees from maintaining any online presence unless specifically reviewed and approved by the G6 Parent Hotel Defendants;

u. G6 Parent Hotel Defendants imposed detailed recordkeeping and reporting requirements on Motel 6 Defendant regarding virtually all aspects of hotel operations;

v. G6 Parent Hotel Defendants supervised and controlled day-to-day operations of the Motel 6 location named herein through detailed information and extensive reports that it obtained through the property management system and other software systems it required Motel 6 Defendant to use; and

w. G6 Parent Hotel Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

**5. The G6 Parent Hotel Defendants and Motel 6 Defendant Knowingly Benefited from Participation in a Sex Trafficking Venture with Each Other and Plaintiff's Traffickers**

102. Motel 6 Defendant and G6 Parent Hotel Defendants are inextricably intertwined.

103. Upon information and belief, at all times of trafficking alleged herein and currently, the Motel 6 location owners and franchisees typically pay a percentage of their total revenue back to the parent companies, G6 Parent Hotel Defendants, and are required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreements.

104. Upon information and belief, per the franchise agreements, G6 Parent Hotel Defendants, could enforce standards through periodic, regular inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate or dangerous. The right of the corporation to enforce their brand standards, including safety standards, is not just their right but their responsibility. Public policy requires full responsibility and accountability under these circumstances.

105. At all times of trafficking alleged herein, G6 Parent Hotel Defendants dictated policies related to safety, security, human trafficking, employee training and the Motel 6 Defendant's responses to human trafficking and sex trafficking.

106. Upon information and belief, at all times of trafficking alleged herein, reservation information for rooms at the subject Motel 6 location passed through a system operated and managed by G6 Parent Hotel Defendants.

107. G6 Parent Hotel Defendants profited from the sex trafficking of Plaintiff when they rented rooms to Plaintiff and/or her traffickers when they knew or should have known that human trafficking, and specifically sex trafficking, was occurring at the subject Motel 6 location before and at that time Plaintiff was being trafficked, and specifically that she was being trafficked.

108. G6 Parent Hotel Defendants and Motel 6 Defendant benefited from the steady stream of income that Plaintiff's traffickers brought to their hotels and hotel brand through room rentals and merchandise purchases.

109. G6 Parent Hotel Defendants and Motel 6 Defendant profited from each and every room that Plaintiff's traffickers rented where Plaintiff was harbored, abused, drugged, beat, hit, raped and maintained for the purpose of sex trafficking.

110. Motel 6 Defendant and G6 Parent Hotel Defendants facilitated the trafficking through its practices, policies, operations and procedures. They failed to take appropriate action to prevent the trafficking of individuals, including Plaintiff, for sex so they could continue to profit from the room rentals, and business that trafficking brings. This is because in order for trafficking to operate and be a successful business—the selling of women and children for sex—it must occur regularly and consistently at a place. Here, the regular and consistent business of trafficking fed the subject Motel 6 Defendant's and G6 Parent Hotel Defendants' business and profits.

111. Motel 6 Defendant and G6 Parent Hotel Defendants owned and operated the subject Motel 6 property while trafficking sellers reigned over the property and buyers paraded in and out of rooms rented for the purpose of trafficking Plaintiff. Their employees and agents observed and should have observed, and heard and should have heard, the buyers parading in and out of its hotel rooms to engage in the sex trafficking of Plaintiff. Their employees and agents observed or should have observed

the trafficking occurring regularly and for weeks at a time, for years, at the subject Motel 6 property but ignored it and/or participated in it directly so they could profit.

112. Plaintiff's trafficking at the subject Motel 6 properties was a result of G6 Parent Hotel Defendants and the Motel 6 Defendant participating in a venture with each other and Plaintiff's criminal individual traffickers. If G6 Parent Hotel Defendants and Motel 6 Defendant had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Plaintiff's trafficking at the subject hotel location and they could have prevented serious and permanent injuries to Plaintiff and several other victims.

113. Despite its actual and/or constructive knowledge that the venture it was engaged in was in violation of 18 U.S.C. §§1591(a) and 1595(a) through the conduct of hotel staff and the widespread trafficking at the subject Motel 6 location, G6 Parent Hotel Defendants and Motel 6 Defendant participated in the venture by continuing to associate with the hotel's staff and with each other to operate the hotel location named herein in a way that it knew or should have known would lead to further violations of 18 U.S.C. § 1591(a), including trafficking of Plaintiff and victims like Plaintiff.

114. G6 Parent Hotel Defendants and Motel 6 Defendant financially benefited from renting hotel rooms to Plaintiff and/or her traffickers for the purpose of trafficking Plaintiff on numerous occasions.

115. G6 Parent Hotel Defendants and Motel 6 Defendant participated in this venture through the conduct described herein as they were jointly responsible for and/or had control over the specific hotel operations at the subject Motel 6 location.

**6. <u>Wyndham Defendants Knew About and Participated in the Sex Trafficking Venture of Plaintiff and others at the Days Inn and Super 8 locations.</u>**

116. Wyndham Parent Hotel Defendants, Days Inn Defendant and Super 8 Defendant have known, since well before Plaintiff was trafficked, that sex trafficking was ongoing and widespread at their Wyndham branded locations and the subject Super 8 (7631 Topanga Canyon Blvd) and Days Inn (450 Pioneer Drive) locations.

117. Before and at all relevant times, the Days Inn Defendant, Super 8 Defendant and Wyndham Parent Hotel Defendants knew that Days Inn and Super 8 properties, including the subject

Days Inn and Super 8, were used for sex trafficking.

118. Wyndham claims it is "the world's largest and most diverse hotel company, encompassing more than 8,400 hotels across 24 brands in 95 countries." It boasts about its twenty-five (25) brands—all of which it created, controlled, and sells to the public by and through its franchisees under a false guise of security and safety.

119. Wyndham owns several brands, including Days Inn by Wyndham and Super 8 by Wyndham, and controls, markets, brands, and holds itself out as the owner and controller of, each. It has numerous hotels in the State of California currently that it profits from. It has a rewards program and credit card with points through which it sends people to its branded properties, including the Days Inn and Super 8 and at all relevant times, the subject Days Inn and Super 8 locations named herein. It allows the public, including traffickers, to book rooms at its branded properties through its website and provides offers and deals online for its properties, including the subject Days Inn and Super 8 locations named herein at all relevant times.

120. The Wyndham Parent Hotel Defendants own, operate and control one of the largest budget hotel chains in the United States. More recently, it has franchised more and more properties in attempt to avoid liability, but it has not given up the control or power over the properties, including at all relevant times, the subject Days Inn and Super 8. It knew and knows details about each property and was and is involved in the day-to-day operations at each property, including the crime that takes place at each and including the subject locations from 2014 to 2018, and before and after.

121. At all relevant times, Wyndam is and has been concerned with profit and not people or people's safety. Upon information and belief, at all times of trafficking alleged herein, the Super 8 and Days Inn Defendants paid Wyndham a significant percent of their total revenue and were required to operate and maintain the property in accordance with the parent Wyndham's brand standards as they are laid out in the franchise agreement and other implied and explicit agreements.

122. Based upon information and belief, the Wyndham Parent Hotel Defendants franchised the subject Days Inn and Super 8 locations to the Days Inn and Super 8 Defendants before and/or during the time Plaintiff was trafficked, abused, and raped there. Wyndham Parent Hotel Defendants conduct detailed inspections of property and areas before entering into franchise agreements, and during the

period of agreements, and did the same here. At all relevant times, the subject high-crime area and property, including the prevalence of commercial sex and signs of sex trafficking, would have been readily apparent upon reasonable inspection.

123. Wyndham Hotel & Resorts, Inc. holds itself out to the public as the operator of Super 8 and Days Inn locations that it franchises, including the subject Days Inn and Super 8 locations named herein, and has made public statements about it being the operator of its franchised properties. At all relevant times, it advertised each property and provided details and misrepresentations about safety to the public in attempt to entice the public to rent rooms at the properties, including the subject properties.

124. Based upon information and belief, at all relevant times, the Wyndham Defendants had a written agreement that gave it control over the subject Days Inn and Super 8 locations named herein and Days Inn and Super 8 Defendants as it relates to booking and payment policies, safety and reports related to safety concerns, crime at the property, and to inspect the property and to make any changes necessary for the safety of guests at the property.

125. Based upon information and belief, Wyndham Parent Hotel Defendants were made aware of the police activity, response to sex crimes including sex trafficking, and police reports from Days Inn and Super 8 Defendants and by and through their own audits, investigations and inspections of the subject Days Inn and Super 8 locations named herein during the time that Plaintiff was trafficked there.

126. Wyndham Parent Hotel Defendants also has put out several public statements over the past ten (10) to fifteen (15) years indicating they know that sex trafficking is a problem in the hotel industry and at their hotels and claiming that they will be committed to fight against it.

127. Wyndham Parent Hotel Defendants signed "the Code" several years ago before Plaintiff was trafficked and thereby promised to adopt policies to combat trafficking.[50] Yet, Defendants have failed to implement most, if not all, of those policies.

128. Wyndham Parent Hotel Defendants are signors of the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking—this was before Plaintiff's trafficking, and Wyndham publicly committed to participate in the programs shown to assist in

[50] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

identifying and preventing sex trafficking inside its brand hotels. Therefore, Wyndham should not only

129. have created effective mandatory Brand standards to be mandated at its branded properties, but it should also have enforced them. Despite Wyndham's direct and vicarious knowledge of trafficking at its hotel, it did not create, implement or enforce effective standards to prevent the trafficking it knew its properties were facilitating, including at the subject Days Inn and Super 8 locations named herein.

130. Wyndham Parent Hotel Defendants states they are committed to protecting human rights and provides hotel employees and guests with reporting channels to report violations of human rights, including incidents of sex trafficking.

131. Based upon information and belief, the Wyndham Parent Hotel Defendants have an ownership interest in and/or owns several other Days Inn and Super 8 locations and other branded hotels that have participated in sex trafficking ventures and where VICE units and other police departments have made several arrests and found adult and minor victims being trafficked for sex.

132. Since 2019, several federal lawsuits have been filed against Wyndham Parent Hotel Defendants and hundreds of sex trafficking victims have come forward against Wyndham Parent Hotel Defendants describing similar stories about how they were blatantly and openly trafficked for sex and abused and harbored at Wyndham properties.

133. From 2014 through 2018, Wyndham Hotel & Resorts, Inc. had access to and did review, intercept, and read online reviews for its properties that it owns and/or operates as franchisors, including the subject Days Inn and Super 8 locations named herein. Reviews from most of the Days Inn and Super 8 locations that Wyndham Parent Hotel Defendants had a franchise and ownership interest in put the Wyndham Parent Hotel Defendants on direct notice that prostitution and sex trafficking had been occurring at many of its locations for over a decade.

134. Internet reviews for the subject Days Inn and Super 8 locations named herein, which Wyndham Parent Hotel, Days Inn and Super 8 Defendants reviewed, read, managed, controlled, and monitored in real time, show the pervasiveness of drugs and activity consistent with trafficking before and during the time Plaintiff was trafficked. Here are just a few examples that put Defendants directly on notice of the trafficking ventures occurring at the subject property at relevant times:

a. Days Inn (450 Pioneer Drive)

i. A Yelp Review in 2018 stated, "The first night we checked in, a woman who looked as if she was a prostitute just walked right into the hotel. No one even said anything or looked at her, making it seem as if this was the norm."

ii. A 2015 Trip Advisor review stated, "The lobby was busy on a daily basis with drug dealers, prostitutes, homeless people."

iii. Another 2015 Trip Advisor review stated, "The mattress had blood stains."

b. Super 8 (7631 Topanga Canyon Blvd)

i. A 2019 Google Review stated," However it might be a hotspot for some suspicious activity (working girls)… Didn't interrupt our stay but it was pretty obvious! The only thing that did interrupt me was the noisey bed above our room. If you know what I mean."

ii. A 2013 Trip Advisor review stated, "Our first night we were greeted by undercover police busting the prostitutes using the spare rooms to turn trick. Maids make extra income unlocking vacant rooms."

iii. Another 2013 Trip Advisor review stated, "the hotel seems to be crawling with homeless, drunks, and prostitutes. I had to deal with… a prostitute who tried to lure me to her room… I was also overcharged by the hotel clerk and called him on it. He returned the $10 overcharge but kept the cash and didn't give me a receipt. Very bad hotel unless you want to get laid!"

iv. A 2014 Trip Advisor review stated, "4 PROSTITUTES WERE SHARING THE ROOM NEXT DOOR. They had men lined up outside both of our rooms and were taking names. It was VERY obvious. I called the manager and told him what was happening and I simply got a refund and apology."

135. Prostitution is commercial sex. Forced commercial sex via force, coercion, or fraud, is sex trafficking. Signs of commercial sex are signs of sex trafficking. Combined with all other obvious signs that showed force, coercion and fraud—Defendants had actual knowledge of sex trafficking occurring at their properties, including signs that Plaintiff was being trafficked for sex there.

136. Wyndham has published reports indicating that it controls and implements anti-trafficking policies at its branded hotels and its website directs consumers to information regarding the same. It has claimed to do this for over a decade, including before and at the time Plaintiff was trafficked.

137. Wyndam claims in a recent public report that it "continues to work to enhance policies and mandate training for all team members to help them identify and report suspected trafficking activities." Thus, it knows sex trafficking is a problem at its properties, and its other public statements show it knows, and at all relevant times knew, trafficking has been an ongoing problem for years.

138. Based on the publicly disclosed human trafficking policies and trainings implemented by Wyndham Parent Hotel Defendants that require employees to report trafficking red flags to Wyndham Parent Hotel Defendants, Plaintiff believes the red flags of her trafficking were reported to Wyndham Parent Hotel Defendants.

139. Upon Information and belief, Wyndham Parent Hotel Defendants knew or should have known that Plaintiff was being trafficked at the subject Days Inn and Super 8 locations named herein, given the hotel policies that require hotel staff who observe signs of trafficking to report up the chain to Wyndham Parent Hotel Defendants. Given these policies, upon information and belief, Plaintiff's obvious signs of trafficking were reported up to Wyndham Parent Hotel Defendants.

140. In 2011, a Change.org petition was published to address rampant gang-based sex trafficking in Wyndham hotels in California. The petition argued that from 2006 to 2011, members of the Crips gang in San Diego ran child sex trafficking rings of at least sixteen (16) girls out of various area hotels. Two subject properties on which many instances of child sex trafficking took place were a Howard Johnson in Escondido, California, and a Travelodge in San Diego, California, both owned and controlled by the Wyndham group, Wyndham Hotel & Resorts, Inc.

141. Upon information and belief, Wyndham Parent Hotel Defendants had a corporate brand management team responsible for creating and administering brand standards and reviewing and analyzing franchisee performance against these standards through vigorous inspections and data collection. Upon information and belief, at all relevant times, Wyndham Brand Quality Assurance Managers, Quality Assurance Auditors, Brand Standards Auditors, Field Quality Inspectors, Franchise Operations Managers, Director of Franchise Operations, Regional Operations Directors, and Field

Operations Managers all oversaw, controlled, inspected and managed the subject Days Inn and Super 8 locations named herein and conducted scheduled and unannounced on-site inspections routinely from 2014 through 2018.

142. From 2014 through 2018, during regular scheduled inspections of the subject Days Inn and Super 8, including overnight inspections, Wyndham Parent Hotel Defendants would have directly witnessed non-compliant operations, guest safety violations, illegal activity, brand rule violations, lack of required anti-trafficking training and onboarding training procedures; failure to implement anti-trafficking policies; clear red flags and signs of Plaintiff being trafficked for sex at the property; and overt actions by Days Inn and Super 8 Owners and Wyndham agents facilitating Plaintiff's traffickers. Upon information and belief, during those inspections, Wyndham Parent Hotel Defendants managers, auditors and inspectors also constantly inspected data, reviewed the Days Inn and Super 8 systems, reviewed incident reports, and filed and analyzed police calls for service and warrants issued to Wyndham and Days Inn and Super 8 owners related to criminal trafficking investigations. Those inspections would have and should have put Wyndham Parent Hotel Defendants on direct notice of the sex trafficking venture that was trafficking Plaintiff at the subject Days Inn and Super 8 locations named herein from 2014 through 2018.

143. At all relevant times, Wyndham also directly employed Compliance and Risk Analysts, Corporate Safety Managers, and Directors of Risk Management that monitored trafficking incident reports; reviewed guest complaints involving trafficking, safety and criminal activity; managed interface with insurers and legal teams; and tracked data and incident patterns at each property and across properties, constantly analyzing and weighing cost benefit analyses. These Wyndham employees allowed Wyndham to identify patterns of criminal activity, including sex trafficking and trafficking indicators, across multiple properties, including the subject Days Inn and Super 8 at all relevant times. This data would have and should have put Wyndham on direct notice that Plaintiff was being trafficked at the subject Days Inn and Super 8 locations from 2014 through 2018, and that it was profiting from that trafficking venture, along with others. Wyndham therefore had both actual and constructive knowledge that the venture was engaged in sex trafficking.

144. Upon information and belief, before and at the time Plaintiff was trafficked at the subject

Days Inn and Super 8 locations, Wyndham Parent Hotel Defendants and Days Inn and Super 8 Defendants saw victims, including but not limited to Plaintiff, being held captive, controlled, coerced, threatened, sold, drugged, abused, hit, beat, injured, deprived of basic needs, and trafficked for sex there. Wyndham Parent Hotel Defendants and Days Inn and Super 8 Defendants and/or their employees and agents while working in the course and scope of their employment and agency with each, directly witnessed all signs of sex trafficking, including the signs of the trafficking of Plaintiff described above.

145. The police responded to 911 calls from outsiders and guests at the subject Days Inn and Super 8 properties regularly from 2014 through 201 for criminal activity, including crimes related to sex trafficking.

146. Wyndham Parent Hotel Defendants and Days Inn and Super 8 Defendants were made aware of those crimes and sex crime incidents in which law enforcement responded at the property during the subject times that Plaintiff was regularly trafficked there for sex, by and through law enforcement and the public, and did not do anything to try to prevent the sex crimes, including sex trafficking, from continuing to occur at the property from 2017 through 2019.

147. In addition to failing to take action to prevent the trafficking of Plaintiff at the Days Inn and Super 8 locations, Wyndham Parent Hotel Defendants and Days Inn and Super 8 Defendants affirmatively facilitated and supported the trafficking venture that exploited Plaintiff. At all relevant times, Defendants maintained an ongoing commercial relationship with Plaintiff's trafficker and his associates, pursuant to which Defendants knowingly derived financial benefit from the repeated rental of rooms used to traffic Plaintiff and other women and girls.

148. Defendants knowingly permitted and accommodated Plaintiff's traffickers' activities at the property and took affirmative steps to enable the continued operation of the trafficking enterprise. Upon information and belief, among other actions, Wyndham Parent Hotel Defendants and Days Inn and Super 8 Defendants and their agents and employees: (1) permitted repeated violations of hotel policies regarding payment methods, guest registration, parking, and loitering; (2) routinely provided the traffickers with requested rooms without scrutiny or intervention; (3) developed familiarity with the traffickers and their associates, including an understanding of their patterns, preferences, and conduct upon arrival; (4) failed to implement or enforce security measures or intervene despite obvious and

ongoing criminal activity occurring on the premises; (5) inaccurately recorded room occupancy information to conceal the presence of multiple individuals; and (6) intentionally placed traffickers in rooms located away from other guests to reduce visibility and avoid detection by law enforcement. Upon information and belief, Wyndham Parent Hotel Defendants had actual knowledge of, or was deliberately indifferent to, these practices and either directly observed, was informed of, or ratified the conduct described above. Through these actions and omissions, Defendants knowingly assisted, facilitated, and benefited from a sex trafficking venture in violation of the Trafficking Victims Protection Reauthorization Act.

**7. Wyndham Exercised Control Over the Subject Days Inn and Super 8 Locations.**

149. Days Inn Defendant owned the Days Inn located at 450 Pioneer Drive, Glendale, California 91203 during the time Plaintiff was trafficked.

150. Super 8 Defendant owned the Super 8 located at 7631 Topanga Canyon Blvd Woodland Hills, California 91304 during the time Plaintiff was trafficked.

151. Wyndham Parent Hotel Defendants are vicariously liable for the acts, omissions, and knowledge of the Days Inn and Super 8 Defendants, employees and staff of the subject Days Inn and Super 8 locations because the employees and staff were Defendants' actual agents or subagents.

152. Upon information and belief, it is a standard practice in the hospitality industry, followed by Wyndham Parent Hotel Defendants for parent companies to set exacting brand quality standards, rules and to retain control over day to day operations, including things like the temperature at which coffee shall be served, room rates, documentation to be kept, how to handle crime, how to report crime, policies and procedures for staff to follow in response to suspected criminal activity, policies and procedures related to staff and employees engaging in criminal activity, employee and agent training, public relations and responses, and to the number of pillows that are placed on the beds, to the types of payments accepted, to when, where, and how guests are greeted and how and where guests must park.

153. Wyndham Parent Hotel Defendants provided their Days Inn and Super 8 locations with signage on and in front of the buildings and throughout the properties. This was done to assure customers that when they checked in, they could expect an experience consistent with the standards of the parent hotel Wyndham brand, including the public statements and promises Wyndham Parent Hotel Defendants

made and makes to the public about safety and comfort. This brand logo is usually displayed on everything in the hotel, such as pens and paper on the bedside table and staff uniforms worn at the front desk during check-in.

154. Wyndham Hotel & Resorts, Inc. provides their hotels branded locations brand name recognition, a marketing campaign, hotel listings, advertising, and participation in online hotel databases. They also provide access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand programs, training programs, audits, financial tools and company websites. Therefore, bookings and room reservations are primarily controlled by Wyndham Parent Hotel Defendants.[51]

155. Wyndham Parent Hotel Defendants subjects and at all relevant times subjected their hotel locations, including the subject Days Inn and Super 8 locations named herein, to detailed standards and requirements regarding the operation of the subject Days Inn and Super 8 through agreements, detailed written policies and manuals and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by the Wyndham Hotel & Resorts, Inc. parent hotel defendant – and Wyndham Parent Hotel Defendants retained the right to enforce its training, policies, rules and standards.

156. Upon information and belief, at all relevant times, Wyndham Parent Hotel Defendants required its branded hotel properties, including the Days Inn and Super 8 Owners named herein, to use a property management system that is linked to the Wyndham Parent Hotel Defendants' corporate network and data center. This is to, among other things, receive reservations, process payment transactions, get data about guests, and get data about crime and other incidents of concern, including human trafficking.

157. Upon information and belief, per the relevant agreements, Wyndham Parent Hotel Defendants may enforce their brand standards and exercise their control through periodic, regular inspections of the hotel locations, including the subject Days Inn and Super 8 locations during the subject time period, backed up with the ultimate threat of and ability to terminate the agreement and operations.[52]

---

[51] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), [The Origins and Growth of Franchising in the Hotel Industry (lodgingmagazine.com)](lodgingmagazine.com).

[52] Many of the franchise disclosure documents, which outline the policies and procedures of franchise agreements can be accessed publicly on https://fddexchange.com/view-fdd-docs.

**8. <u>The Super 8 Defendant and Days Inn Defendant and Respective Staff Acted as Actual Agents of the Wyndham Parent Hotel Defendants</u>**

158. Wyndham Parent Hotel Defendants is vicariously liable for the acts, omissions, and knowledge of their employees, agents and staff of the subject Days Inn and Super 8 locations described herein, which are Wyndham Parent Hotel Defendant's actual agents or subagents.

159. Days Inn and Super 8 Defendants and Wyndham Parent Hotel Defendants subjected Days Inn and Super 8 employees and agents to detailed training, standards and requirements regarding the operation of the Days Inn and Super 8 locations named herein through their agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by Wyndham Parent Hotel Defendants—and the Corporation retained the right to enforce its training, policies, rules and standards. It could have here to prevent trafficking at its hotel, but chose to participate rather than eliminate it.

160. Upon information and belief, the standards that Defendant Wyndham Parent Hotel Defendants imposed and impose on their branded properties at all relevant times included but were not limited to the following:

a. Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Days Inn and Super 8 used at these subject locations;

b. Covered virtually all aspects of hotel operations, including internal operating functions;

c. Dictated the specific manner in which Days Inn and Super 8 Defendants and the subject Days Inn and Super 8 locations and hotel staff carry were to carry out most day-to-day functions at the Days Inn and Super 8; and

d. Significantly exceeded what was necessary for Wyndham Parent Hotel Defendants to protect its registered trademarks.

161. In addition to the ways described above, upon information and belief, Wyndham Parent Hotel Defendants exercised and reserved the right to exercise systemic and pervasive control over Days Inn and Super 8 Defendants' and the subject Days Inn and Super 8's day-to-day operation of the subject Days Inn and Super 8 locations during relevant times, including in the following ways:

a. Defendant Wyndham Parent Hotel Defendants required Days Inn and Super 8 Defendants

and management of the hotel to participate in training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Wyndham Parent Hotel Defendants to protect its registered trademarks;

b. Defendant Wyndham Parent Hotel Defendants provided training for hotel management and select hotel staff on-site at the Days Inn and Super 8 locations and Wyndham Parent Hotel Defendants went to the Days Inn and Super 8 locations;

c. Wyndham Parent Hotel Defendants required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

d. Wyndham Parent Hotel Defendants controlled training provided by Days Inn and Super 8 Defendants to hotel staff by dictating the content of that training, especially related to crime and/or human trafficking, providing required content for that training, and dictating the training methods used;

e. Wyndham Parent Hotel Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that Days Inn and Super 8 was required to purchase to operate the Days Inn and Super 8 location, or to use, Wyndham Parent Hotel Defendants designated approved vendors and prohibited the hotel from purchasing goods and services from anyone other than an approved vendor such that it had to sign off or give permission;

g. Wyndham Parent Hotel Defendants required the Days Inn and Super 8 Defendants to sign technology, software, and data agreements governing the terms under which it must procure, store, share and use technical services, software and data related to the subject Days Inn and Super 8. Days Inn and Super 8 Defendants were required to install, and use certain brands, types, make, and/or models of hardware, software, peripheral equipment, data storage, data sharing devices and software and support services to perform internal operating functions at the subject Days Inn and Super 8;

h. Wyndham Parent Hotel Defendants consistently communicated with, directed, instructed, and got updates from certain staff and employees of Days Inn and Super 8 Defendants

and any management companies of the subject Days Inn and Super 8;

i. Wyndham Parent Hotel Defendants established detailed job descriptions for several positions in its Days Inn and Super 8 hotels, including the subject Days Inn and Super 8, and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j. Wyndham Parent Hotel Defendants Defendant set requirements for the hiring process used by Days Inn and Super 8 Defendants and property management companies, and oversaw employee discipline processes and terminations such that Wyndham Parent Hotel Defendants wanted to and did retain control over employment issues between Days Inn and Super 8 Defendants and their employees and agents that ran the day-to-day operations at the subject Days Inn and Super 8;

k. Based upon information and belief, Wyndham Parent Hotel Defendants provided benefits and perks for employees of Days Inn and Super 8 Defendants and anyone that worked for the subject Days Inn and Super 8;

l. Wyndham Parent Hotel Defendants required Days Inn and Super 8 Defendants to use a customer resource management program maintained and operated by the Wyndham Parent Hotel Defendants;

m. Wyndham Parent Hotel Defendants controlled channels for guests to report complaints or provide feedback regarding the subject Days Inn and Super 8 location and directly participated in the response and/or supervised the response to customer complaints or other feedback. Wyndham Parent Hotel Defendants retained the right to provide refunds or other compensation to guests and to require Days Inn and Super 8 Defendants or other Days Inn and Super 8 employees to pay associated costs;

n. Wyndham Parent Hotel Defendants generated reports and analysis of guest complaints and online reviews for the subject Days Inn and Super 8 location;

o. Wyndham Parent Hotel Defendants required Days Inn and Super 8 Defendants and the subject Days Inn and Super 8 to use a Guest Relations Application/software owned, operated, and maintained by Wyndham Parent Hotel Defendants to manage all guest data

and information. Wyndham Parent Hotel Defendants could use the backend of this system to analyze data and generate reports;

p. Wyndham Parent Hotel Defendants set detailed requirements for insurance that their properties must purchase and retain the right to purchase insurance for the locations and to bill the hotel owner directly for that insurance if Wyndham Parent Hotel Defendants determines that the property has not purchased adequate insurance;

q. Wyndham Parent Hotel Defendants regularly audited the books and records of the subject Days Inn and Super 8 Locations and retained the right to do so;

r. Wyndham Parent Hotel Defendants Defendant conducted frequent and unscheduled inspections of Days Inn and Super 8 properties, including the subject Days Inn and Super 8 locations;

s. Wyndham Parent Hotel Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of agreements if Days Inn and Super 8 locations violated any of its detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the subject Days Inn and Super 8;

t. Wyndham Parent Hotel Defendants controlled all marketing for the subject Days Inn and Super 8 and prohibited it from maintaining any online presence unless specifically reviewed and approved by the Wyndham Parent Hotel Defendants, including but not limited to on all sites it was reviewed and reviewable;

u. Wyndham Parent Hotel Defendants imposed detailed recordkeeping and reporting requirements on Days Inn and Super 8 Defendants and the subject Days Inn and Super 8 regarding virtually all aspects of hotel operations;

v. Wyndham Parent Hotel Defendants supervised and controlled day-to-day operations of the Days Inn and Super 8 through detailed information and extensive reports that it obtained through the property management system and other software systems it required Days Inn and Super 8 Defendants to use;

w. Wyndham Parent Hotel Defendants retained the virtually unlimited right to revise policies

or adopt new requirements for the day-to-day aspects of hotel operations at the subject Days Inn and Super 8.

x. Wyndham Parent Hotel Defendants required that Days Inn and Super 8 Defendants provide certain amenities in very specific ways and monitored the day-to-day offerings, including wi-fi, housekeeping, security, on-site parking, group rates, credit cards, online bookings, payment options that must and should have been accepted, free breakfast, "best price guarantees," and booking and data technology; and

y. Wyndham Parent Hotel Defendants flagged the subject Days Inn and Super 8, which means it put the property under the umbrella of its company and told the public that it was part of a recognized brand and entered into an agreement with the Days Inn and Super 8 Defendants that mandated Wyndham Parent Hotel Defendants had control over the operations and that it must operate under the brand's standards, rules and guidelines.

9. **Wyndham Defendants Knowingly Benefited from Participation in a Sex Trafficking Venture with Each Other and Plaintiff's Traffickers.**

162. Wyndham Parent Hotel Defendants and Days Inn and Super 8 Defendants are inextricably intertwined.

163. Upon information and belief, at all times of trafficking alleged herein and currently, the Days Inn and Super 8 locations typically pay a percentage of their total revenue back to the parent company, Wyndham Parent Hotel Defendants, and are required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement and through other direct and implied agreements.

164. Upon information and belief, per the franchise agreements, Wyndham Parent Hotel Defendants, could enforce standards through periodic, regular inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate or to engage in illegal activities. The right of the corporation to enforce their brand standards, including safety standards, is not just their right but their responsibility.

165. At all times of trafficking alleged herein, Wyndham Parent Hotel Defendants dictated policies related to safety, security, human trafficking, employee training and the subject Days Inn and

Super 8 Locations' response to human trafficking and sex trafficking.

166. Upon information and belief, at all times of trafficking alleged herein, reservation information for rooms at the subject Days Inn and Super 8 passed through a system operated and managed by Wyndham Parent Hotel Defendants.

167. Defendant Wyndham Parent Hotel Defendants profited from the sex trafficking of Plaintiff when they rented rooms to Plaintiff and/or her traffickers when they knew or should have known that human trafficking was occurring at the subject Days Inn and Super 8 before and at that time, and specifically that she was being trafficked.

168. Defendant Wyndham Parent Hotel Defendants benefited from the steady stream of income that Plaintiff's traffickers brought to their hotels and hotel brand.

169. Defendant Wyndham Parent Hotel Defendants profited from each and every room that Plaintiff's traffickers rented where Plaintiff was harbored, abused, drugged and maintained for the purpose of sex trafficking.

170. Defendant Wyndham Parent Hotel Defendants facilitated the trafficking through its practices, policies, operations and procedures. They failed to take appropriate action to prevent the trafficking of individuals, including Plaintiff, for sex so they could continue to profit from the room rentals, and business that trafficking brings.

171. Days Inn and Super 8 Defendants owned and operated the subject Days Inn and Super 8 while trafficking sellers reigned over the property and buyers paraded in and out of rooms rented for the purpose of trafficking Plaintiff and others. Their employees and agents observed and should have observed the buyers parading in and out of its hotel rooms to engage in the sex trafficking of Plaintiff. Their employees and agents observed or should have observed the trafficking occurring regularly and for weeks at a time, for years, at the subject Days Inn and Super 8 location but ignored it so they could profit.

172. Plaintiff's trafficking at the subject Days Inn and Super 8 location was a result of Wyndham Parent Hotel Defendants and the Days Inn and Super 8 Defendants participating in a venture with each other and Plaintiff's criminal traffickers. If Wyndham Parent Hotel Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a),

they would not have received a benefit from Plaintiff's trafficking at the subject hotel location.

173. Despite its actual and/or constructive knowledge that the venture it was engaged in was in violation of 18 U.S.C. §§1591(a) and 1595(a) through the conduct of hotel staff and the widespread trafficking at the subject Days Inn and Super 8, Defendant Wyndham Parent Hotel Defendants participated in the venture by continuing to associate with the hotel staff and with each other to operate the hotel location named herein in a way that it knew or should have known would lead to further violations of 18 U.S.C. § 1591(a), including trafficking of Plaintiff and victims like Plaintiff.

174. Defendant Wyndham Parent Hotel Defendants financially benefitted from renting hotel rooms to Plaintiff and her traffickers on numerous occasions, which were used for the purpose of sex trafficking Plaintiff.

175. Defendant Wyndham Parent Hotel Defendants participated in this venture through the conduct described herein as they were jointly responsible for and/or had control over the specific hotel operations at the subject Days Inn and Super 8 location.

**10. <u>La Brea Defendant Knew About, Participated in and Knowingly Benefited from the Sex Trafficking Venture of Plaintiff at the Hollywood La Brea Location.</u>**

176. From 2015 to 2017, Plaintiff's trafficker repeatedly rented rooms at Hollywood La Brea Inn for extended periods, including weeks at a time in 2016–2017, such that hotel staff knew and recognized Plaintiff and her trafficker.

177. During Plaintiff's stays, Hollywood La Brea Inn employees observed persistent and obvious sex-trafficking indicators, including repeated cash payments; daily or near-daily extensions; requests for rooms isolated from other guests and "do not disturb" instructions; unusually heavy male foot traffic to the room at all hours; repeated requests for extra linens; and rooms left with numerous used condoms and drug-use debris.

178. Plaintiff's visible condition on-property—including bruising and abrasions consistent with beatings; appearing emaciated, unwashed, sleep-deprived, and distraught; loitering/soliciting on hotel grounds; and wearing clothing inappropriate for weather—added to the trafficking indicators observed by staff.

179. Plaintiff's screams, cries for help, and audible violence emanating from the room were

sufficiently loud and frequent that hotel personnel could and did hear them during their duties, yet no employee intervened or contacted law enforcement.

180. Notwithstanding these red flags, Hollywood La Brea Inn continued to rent rooms to Plaintiff's trafficker over an extended period, thereby providing the venue and essential services that harbored and maintained Plaintiff for commercial sex.

181. A Hollywood La Brea Inn maintenance employee repeatedly watched forced sex acts through a window, on some occasions used an employee key to enter the room to observe, and encouraged sex buyers—conduct that evidences actual, on-premises knowledge and affirmative participation by hotel personnel.

182. Plaintiff's trafficker used the hotel's Wi-Fi to post commercial sex advertisements and to communicate with and schedule sex buyers, while Hollywood La Brea Inn failed to adopt or enforce reasonable internet-use policies or monitoring practices despite the ongoing trafficking indicators on-site.

183. Hotel staff accepted money to look the other way or to warn traffickers about law-enforcement presence and were on familiar terms with traffickers, corroborating actual knowledge and deliberate facilitation.

184. Hollywood La Brea Inn knowingly benefited every night that it provided rooms and related services to the trafficking venture by receiving room revenue and other things of value, including data generated by guest Wi-Fi usage tied to the venture.

185. Hollywood La Brea Inn knew or, at minimum, should have known that the venture involved sex trafficking in light of the sustained and blatant on-property indicators, its employees' direct observations, and industry-standard duties to adopt anti-trafficking policies, training, and procedures under the circumstances.

186. Knowledge of Hollywood La Brea Inn employees and agents is imputed to the entity, and the hotel's continued provision of rooms and services in the face of the foregoing facts constitutes participation in a common enterprise that recruited, harbored, maintained, and provided Plaintiff for commercial sex.

**11. Defendants Facilitated the Sex Trafficking of Plaintiff**

187. During the times Plaintiff was trafficked at the subject properties, Defendants participated directly in most aspects of the operation of the subject properties for which they owned, had an ownership interest in, franchised and/or controlled that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Plaintiff as follows:

a. Defendants assumed responsibility and control over the human trafficking response of their subject motel properties, including design and implementation of practices to prevent trafficking, safety, and security procedures, employee, and franchisee education, training and response, partnership with external organizations, and advocacy;

b. Defendants retained control over when its branded motel would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in their branded motel location;

c. Defendants retained control over determining which motels/hotels needed additional training or other resources on the risk of trafficking occurring and other related criminal activity based on actual activities and crimes known to have occurred at each;

d. Defendants retained control to terminate hotel staff and/or agreements based on the response to human trafficking;

188. Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives it, and the consequences of someone not participating or failing to follow such training; and

189. Defendants retained control over setting, supervision, overseeing, and enforcement policies and procedures for housekeeping services at the subject motel location, including how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

190. Defendants provided the means, methods and a location for traffickers, including Plaintiff's traffickers, to traffic and sell victims for commercial sex and commit sex trafficking from 2014 to 2018.

191. As a direct and proximate result of these egregious practices of Defendants, and each of

them, Plaintiff and other victims of sex trafficking and exploitation have been permanently injured and damaged physically, emotionally, psychologically, and financially.

192. Defendants had both actual and constructive knowledge of the trafficking of Plaintiff at the hotel locations they owned and operated because the trafficking was the direct result of Defendants facilitating the trafficking at the subject locations.

193. Defendants are responsible for the acts, omissions, and knowledge of all employees and agents of the subject hotel locations when operating the hotel because these acts and omissions were committed in the course and scope of employment. Defendants ratified these acts and omissions because Defendants failed to exercise reasonable care in the hiring, training, and supervision of these employees given the specific risks known and reported to Defendants of sex trafficking occurring that the subject hotel locations; and Defendants failed to have repercussions and to terminate employment of employees and agents directly facilitating trafficking.

194. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject locations, Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims and Plaintiff.

195. Defendants knew or were willfully blind to the fact that Plaintiff was being trafficked and, despite this, benefited from continued association with her traffickers by providing them with a venue in the form of hotel rooms and related services, to harbor and facilitate the sexual exploitation of Plaintiff.

196. Defendants also facilitated widespread trafficking at their hotel locations, including the trafficking of Plaintiff in ways including: (1) allowing inappropriate and inadequate practices for hiring, training, supervising, managing and disciplining front line staff regarding issues related to human trafficking; (2) inadequate and inadequately enforced sex trafficking notice and training for hotel staff; (3) choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, laws, and/or applicable franchisor policies and procedures; and (4) implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**12. <u>Defendants are Jointly and Severally Responsible for the Trafficking of Plaintiff</u>**

197. Parent company Defendants, including G6 Defendants and Wyndham Defendants, participated in a joint venture with each of its franchisees that owned the subject motels and hotels where Plaintiff was trafficked from 2014 to 2018, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

198. Upon information and belief, the operation of the subject Motel 6 was part of a single unified operation by G6 Defendants. Upon information and belief, the subject Motel 6 location shared common parent companies, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, G6 Defendants acted jointly to own, operate, control, manage, and supervise the subject Motel 6 location and Motel 6 Defendants. As an integrated enterprise and/or joint venture, Defendants were separately and jointly responsible for compliance with all applicable laws.

199. Upon information and belief, the operation of the subject Days Inn and Super 8 were part of a single unified operation by Wyndham Parent Hotel Defendants. Upon information and belief, Days Inn and Super 8 had a parent company, was subject to joint control, and operated as an integrated enterprise and/or as an alter-ego. Upon information and belief, Wyndham Parent Hotel Defendants acted to own, operate, control, manage, and supervise the subject Days Inn and Super 8 locations. As an integrated enterprise and/or joint venture, Wyndham Parent Hotel Defendants and the subject Days Inn and Super 8 Defendants separately and jointly responsible for compliance with all applicable laws.

## <u>CAUSES OF ACTION AGAINST DEFENDANTS</u>

## <u>Sex Trafficking Under 18 U.S.C. § 1595.</u>

**13. Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Against All Defendants)**

199. Plaintiff realleges and incorporates the allegations above, as if fully set forth herein.

200. Plaintiff is a victim of sex trafficking within the meaning of §1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

201. Defendants, and each of them, are perpetrators within the meaning of 18 U.S.C §1595(a) because they:

a. Violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored and maintained individuals, including Plaintiff, knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property; and

b. Violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel properties.

202. Violations of 18 U.S.C §1595(a) by each of the Defendants as "perpetrators" operated jointly with other unlawful acts and omissions alleged in this Complaint, to cause Plaintiff to suffer substantial physical and psychological injuries and all other damages described herein as a direct and proximate result of being trafficked and sexually exploited at the Defendants' hotel properties.

**14. Cause of Action: Beneficiary Liability under §1595 (a) of the TVPRA (All Defendants).**

203. Plaintiff realleges and incorporates the allegations above, as if fully set forth herein.

204. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

205. Through acts and omissions described throughout this Complaint, Defendants received a financial benefit from participating in a venture with each other and traffickers, including Plaintiff's traffickers, despite the fact that each defendant knew or should have known that these traffickers were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2) at Defendants' properties, including the subject locations alleged in this Complaint. As more specifically alleged above, Defendants took part in a common undertaking and enterprise involving risk and potential profits, and here, actual profits resulted. Defendants' employees had a direct association with the traffickers and knowingly

facilitated the traffickers, which, as shown more thoroughly in the incorporated allegations above, showed a continuous business relationship between the traffickers and Defendants such that the pattern of conduct appears to be a tacit agreement between them. Thus, Defendants are liable as a beneficiary under 18 U.S.C §1595(a).

206. Through the acts and omissions described throughout this Complaint, Defendants received a financial benefit from participating in a venture with each other and Plaintiff's traffickers in the operations of their respective hotel properties even though Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

207. Violations of 18 U.S.C §1595(a) by Defendants as "beneficiaries" operated jointly with other unlawful acts and omissions alleged in this Complaint, to cause Plaintiff to suffer substantial physical and psychological injuries and all other damages alleged herein because of being trafficked and sexually exploited at the Defendants' hotel properties.

**15. Cause of Action: Vicarious Liability for TVPRA Violations (Wyndham Parent Hotel Defendants and G6 Parent Hotel Defendants)**

208. Plaintiff realleges and incorporates the allegations above, as if fully set forth herein.

209. Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

210. Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its alter-egos.

211. Motel 6 Defendants—Hollywood Host Ventures, LLC—acted as the actual agents of G6 Parent Hotel Defendants when operating their respective subject Motel 6 property identified herein and in committing the wrongful acts and inactions alleged herein.

212. Days Inn and Super 8 Defendants—The Glendale Hotel LLC and CJS Corporation—acted as the actual agents of Wyndham Parent Hotel Defendants when operating the subject Days Inn and Super 8 hotel properties identified herein and in committing the wrongful acts and inactions alleged herein.

213. Through the wrongful acts and omissions described throughout this Complaint, G6 Parent Hotel Defendants exercised or retained the right to exercise systematic and day-to-day control over the

means and methods used by its franchisees, Motel 6 Defendant, to operate the subject Motel 6 property.

214. Through the wrongful acts and omissions described throughout this Complaint, Wyndham Parent Hotel Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisees, Days Inn and Super 8 Defendants, to operate their respective subject Days Inn and Super 8 hotel properties.

215. G6 Parent Hotel Defendants are vicariously liable for the TVPRA violations of their franchisees, the Motel 6 Defendants, and the subagents of such franchisees.

216. Wyndham Parent Hotel Defendants are vicariously liable for the TVPRA violations of their franchisees, the Days Inn and Super 8 Defendants, and the subagents of such franchisees.

217. Additionally, on information and belief, each of the parent hotel Defendants, G6 Parent Hotel Defendants and Wyndham Parent Hotel Defendants, participated in a joint venture with each of their franchisees, operating each of the respective and applicable subject locations: the subject Motel 6 and the subject Days Inn and Super 8. They each had highly integrated operations at the hotels, shared revenue and profits generated from the hotels and exercised mutual control over the sex trafficking venture at the hotels. They functioned as a single integrated entity and/or as alter-egos of one another with each of their franchisees and are therefore each directly and proximately liable for the harms and damages caused to Plaintiff as a result.

## **JOINT AND SEVERAL LIABILITY**

218. Plaintiff realleges and incorporates the allegations above, as if fully set forth herein.

219. “Joint and several liability ‘applies when there has been a judgment against multiple defendants.’”[53] If two or more defendants jointly cause harm, each defendant is held liable for the entire amount of the harm; provided, however, that the plaintiff recovers only once for the full amount.[54]

220. Federal law allows an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor’s negligence was a substantial factor in causing, without regard

[53] *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220–21 (1994).

[54] See 735 ILCS 5/2-1117; see Restatement (Second) of Torts § 875 (1977); *Honeycutt v. United States*, 137 S. Ct. 1626 (2017).

to his proportion of fault and even if the concurrent negligence of others contributed to the incident.[55]

221. Plaintiff alleges each Defendant should be held joint and severally liable to Plaintiff for the totality of her injuries and damages alleged herein.

**DISCOVERY RULE**

222. To the extent defendants assert an affirmative defense of limitations, Plaintiff invokes the discovery rule. At the time she was harmed and through at least 2018, Plaintiff was under coercion and control of traffickers who abused and manipulated her. Thus, Plaintiff did not discover and could not have reasonably discovered the legal cause of her injuries more than ten years before she filed this lawsuit. While she was under the control of her traffickers, Plaintiff– through no fault of her own – lacked the information to bring claims because she did not know both her injuries and the cause of her injuries. This lack of information was due to no fault on the part of Plaintiff but rather was a direct result of Plaintiff being kept under the control of her trafficker, which Defendants facilitated.

223. At the time Plaintiff was harmed, she did not know that she was the victim of human trafficking as the term is defined by law, that her injuries arose from being trafficked at Defendant's hotels or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in position to discover the legal cause of her injuries, more than ten years before suit was filed.

224. To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the Doctrine of Equitable Tolling because, as a result of being a victim of trafficking, Plaintiff faced extraordinary circumstances, which arose through no fault of her own, that prevented her from pursing her legal remedies including but not limited to the filing of a lawsuit, and those circumstances did not end more than 10 years before Plaintiff filed this lawsuit. Plaintiff's claims are timely and do not result in prejudice to Defendants.

225. As a result of her continuous trafficking at the subject hotels through at least 2018, Plaintiff was beaten, drugged, sexually assaulted, and mentally abused. She lacked the mental capacity to recognize the extent and scope of her injuries or those responsible particularly those who financially

[55] *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979) (citations omitted); *Manganiello v. City of New York*, No. 07 Civ. 3644, 2008 WL 2358922 (S.D.N.Y. June 10, 2008), affirmed, 612 F.3d 149 (2nd Cir. 2010).

benefited from her trafficking but may not have been seen to be directly involved.

226. Plaintiff was under the continuous control of her traffickers through at least 2018. As a result, she did not have the freedom to investigate her claims, to identify those responsible or to seek legal representation necessary to pursue her legal rights. This continuous trafficking resulted from Defendants continuous facilitating of trafficking at the subject hotel locations named herein and Defendants ongoing venture with one another and with criminal traffickers.

227. To the extent that Defendants assert an affirmative defense of limitations, Plaintiff also invokes the Continuing Tort Doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct.

228. Plaintiff was subject to continuous trafficking at the subject hotel locations through at least 2018, which is not more than 10 years before Plaintiff filed this lawsuit.

229. This continuous trafficking resulted from Defendants continuous facilitation of trafficking at the subject hotel locations named herein and Defendants ongoing venture with one another and with criminal traffickers.

## **DAMAGES**

230. Defendants' wrongful acts and omissions described above, individually and collectively, caused Plaintiff to sustain legal damages.

231. Plaintiff did suffer the following injuries as a direct and proximate result of Defendants, and each of their, wrongful actions and inactions alleged herein, and as such Plaintiff is entitled to be compensated for past and future personal injuries, non-economic damages, and economic damages, see, e.g., 18 U.S.C. §§ 1593, 1595, including:

c. Actual damages;

d. Direct damages;

e. Incidental and consequential damages;

f. Lost earnings and lost earning capacity;

g. Necessary medical expenses;

h. Life care expenses;

i. Physical pain and suffering;

j. Physical impairment;

k. Mental anguish and emotion distress damages (until trial and in the future);

l. Restitution;

m. Unjust enrichment; and

n. Disgorgement of profits.

232. Plaintiff is entitled to pre- and post-judgment interest at the maximum legal rates.

**PUNITIVE DAMAGES**

233. Plaintiff is entitled to punitive damages under the applicable statutes against Defendants, and each of them, for each and every cause of action alleged herein, as a result of Defendants' outrageous, wanton, willful, and malicious conduct underlying Plaintiff's claims. See Ditullio v. Boehm, 662 F.3d 1091 (9th Cir. 2011).

**ATTORNEY FEES**

234. Plaintiff is entitled to recover her costs and reasonable, necessary, or customary attorneys' fees from Defendants under the applicable statutes. *See* 18 U.S.C. § 1595(a).

235. All conditions precedent to Plaintiff's recovery of its costs and attorneys' fees have occurred or will occur prior to entry of judgment in this suit.

**JURY DEMAND**

236. Plaintiff requests a jury trial in this action.

**PRAYER**

237. For these reasons, Plaintiff prays that this case be set for trial before a jury, and that upon a final hearing of the cause, judgment be entered for Plaintiff against Defendants jointly and severally, for:

o. All economic damages to which she is entitled;

p. All actual damages to which she is entitled;

q. All incidental and consequential damages to which she is entitled;

r. All mental anguish and emotional distress damages to which she is entitled;

s. All restitution damages to which she is entitled;

t. All unjust enrichment damages to which she is entitled;

u. All exemplary, treble, and/or punitive damages;

v. Attorneys' fees and costs of suit;

w. Pre-judgment and post-judgment interest at the highest rate allowed by law; and

x. All other relief to which she is or may be entitled in law or in equity.

SINGLETON SCHREIBER, LLP

Dated: May 13, 2026 By: */s/ Katie Llamas*

Meagan Verschueren (CA 313117)
mverschueren@singletonschreiber.com
Katie Llamas (CA 303983)
kllamas@singletonschreiber.com
Kristina Aiad-Toss *Pro Hac Vice applicant*
ktoss@singletonschreiber.com
Marisa Ong *Pro Hac Vice applicant*
mong@singletonschreiber.com
Pilar Borneo
pborneo@singletonschreiber.com
SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Ste. 1025
San Diego, CA 92108
Tel. (619) 771-3473

Steven C. Babin, Jr. *Pro Hac Vice applicant*
steven.babin@babinlaws.com
Penny L. Barrick *Pro Hac Vice applicant*
penny.barrick@babinlaws.com
Babin Law, LLC
10 West Broad Street, Ste. 900
Columbus, Ohio 43215
Tel. (614) 761-8800

Attorneys for Plaintiff JANE DOE